UNITED STATES BANKRUPTCY COURT                    *FOR PUBLICATION*
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 15 |
| Fairfield Sentry Limited, et al. | Case No. 10-13164 (JPM) |
| | (Jointly Administered) |
| Debtors in Foreign Proceedings. | |
| FAIRFIELD SENTRY LTD. (In Liquidation), et al., | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 10-03627 (JPM) |
| BNP PARIBAS SECURITIES SERVICES LUXEMBOURG, et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO DISMISS

*APPEARANCES:*

**ALLEGAERT BERGER & VOGEL LLP**
*Counsel for Defendant, Rothschild & Co Asset Management*:
111 Broadway
New York, New York 10006
By:     John F. Zulack
        Lauren J. Pincus
        David A. Shaiman
        John S. Craig
        Bianca Lin

**BROWN RUDNICK LLP**
*Attorneys for the Plaintiffs Joint Liquidators*
Seven Times Square
New York, NY 10036
By:     Jeffrey L. Jonas
        David J. Molton
        Marek P. Krzyzowski

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

Pending before the Court is the motion of the Defendant, Rothschild & Co. Asset Management ("Rothschild & Co" or "Defendant")[1] as manager of the Elan Gestion Alternative fund, to dismiss the Fifth Amended Complaint (the "Amended Complaint") for lack of personal jurisdiction.  Mot. to Dismiss, ECF[2] No. 174.  The Court held a hearing on the Motion to Dismiss on May 3, 2024 (the "Hearing").  For the reasons set forth herein, the Court DENIES the Defendant's Motion to Dismiss.

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).  This Court previously concluded that it has subject matter jurisdiction over this and related actions.  *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018); *see also* Stip. Order, ECF No. 116.  Personal jurisdiction is contested by the Defendant and will be discussed below.

## III.    BACKGROUND

This adversary proceeding was filed on September 20, 2010.  Compl., ECF No. 1. Kenneth M. Krys and Greig Mitchell (the "Liquidators"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation)

---

[1]    Rothschild & Co was sued as Rothschild & Cie Banque-EGA.  Mem. L. at 1, ECF No. 177; Am. Compl. ¶ 42.  Defendant was formerly known as Rothschild & Cie Gestion.  Mem. L. at 1.  The Defendant was  manager of the Elan Gestion Alternative fund (the "EGA Fund"), and several allegations made by Plaintiffs refer to the actions of the Defendant as "EGA."  *Id.*; *see, e.g.*, Opp'n at 1, ECF No. 260.

[2]    Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 10-03627-jpm unless otherwise noted.

("Sentry") and Fairfield Sigma Limited (In Liquidation) ("Sigma" and, together with Sentry, the "Fairfield Funds") filed the Amended Complaint on August 11, 2021. Am. Compl., ECF No. 143. Via the Amended Complaint, the Liquidators seek the imposition of a constructive trust and recovery of nearly $47 million allegedly received by BNP Paribas Securities Services Luxembourg ("BNP Paribas SSL") and Beneficial Owners of the Accounts Held in the Name of BNP Paribas Securities Services Luxembourg (the "Beneficial Owners"). Id. ¶¶ 1, 34. Of that amount, Defendant allegedly received $5.6 million through a redemption payment from its investment in Sigma. Opp'n at 1, ECF No. 260.[3] All payments were made in Euros, so the Plaintiffs have "applied the exchange rate as of the date of that redemption payment out of Sigma." Id. at 1 n. 2. The amount received by Defendant in Euros was €4,514,478.02. Id.

## A. **The BLMIS Ponzi Scheme**

This adversary proceeding arises out of the decades-long effort to recover assets of the Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme.[4] Am. Compl. ¶ 1. BNP Paribas SSL allegedly invested, either for its own account or for the account of others, into several funds, including Sentry and Sigma, that channeled investments into BLMIS. Id. ¶¶ 2, 5, 16.

Fairfield Sentry was a direct feeder fund in that it was established for the purpose of bringing investors into BLMIS, thereby allowing Madoff's scheme to continue. Id. ¶¶ 5; 46–47;

---

[3]    At the time of the filing of the Fifth Amended Complaint, the Plaintiffs made no specific allegations as to the exact amounts received by any of the Beneficial Owners. With respect to Rothschild & Co, the Amended Complaint states in relevant part that "[b]ased on Sentry and Sigma records, some or all of the Redemption Payments made to BNP Paribas SSL may have been paid to an account holder or holders associated with the Beneficial Shareholder, Rothschild & Cie Banque-EGA." Am. Compl. ¶ 42. The Amended Complaint alleges that several other defendants may have received redemption payments made to BNP Paribas SSL. Id. ¶¶ 35–44. This opinion concerns only those payments that the Plaintiffs allege were paid to Rothschild & Co.

[4]    The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff. Details of that scheme have been recounted by many courts. See, e.g., In re Madoff, 598 B.R. 102, 106 (S.D.N.Y. 2019), aff'd 818 F. App'x 48 (2d Cir. 2020).

*see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools money from numerous investors and then places it into a 'master fund' on their behalf. A master fund—what Madoff Securities advertised its funds to be—pools investments from multiple feeder funds and then invests the money."). Fairfield Sigma, in contrast, was an indirect feeder fund, established to facilitate investment in BLMIS through Fairfield Sentry for foreign currency. Am. Compl. ¶¶ 46–47. BLMIS used investments from feeder funds, like the Fairfield Funds, to satisfy redemption requests from other investors in the scheme. *Id.* ¶¶ 6–8, 14. Without new investors, BLMIS would have been unable to make payments to those who chose to withdraw their investments, and the scheme would have fallen apart. *Id.* ¶¶ 7–8, 13–15, 47, 50–52.

The Amended Complaint alleges that investors received payments on account of their shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV"). *Id.* ¶ 7. BNP Paribas SSL is allegedly "one such investor." *Id.* To calculate the NAV, administrators used statements provided by BLMIS that showed "securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry." *Id.* ¶ 49. In fact, no securities were ever bought or sold by BLMIS for Sentry, and none of the transactions on the statements ever occurred. *Id.* ¶ 50. The money sent to BLMIS by the Fairfield Funds for purchase of securities was instead used by Bernard Madoff to pay other investors or was "misappropriated by Madoff for other unauthorized uses." *Id.* The NAVs were miscalculated, and redemption payments were made in excess of the true value of the shares. *Id.* ¶ 53. The Fairfield Funds were either insolvent when the redemption payments were made or were made insolvent by those payments. *Id.* ¶ 52.

BNP Paribas SSL is a corporate entity organized under the laws of Luxembourg with a registered address in Luxembourg. BNP Paribas SSL is an affiliate and subsidiary of its ultimate

parent entity, BNP Paribas S.A. (collectively the "BNP Companies"). Am. Compl. ¶ 59. BNP Paribas S.A. is described as a "banking and financial services conglomerate with headquarters in Paris, France, and offices in New York, New York." *Id.* BNP Paribas SSL is a bank that invested in one of many BLMIS feeder funds for itself or others. *Id.* ¶ 2.

Rothschild & Co is a corporate entity organized under the laws of France with a registered address in Paris, France. *Id.* ¶ 42. Rothschild & Co acted as the investment manager of the EGA Fund and was its legal representative. Opp'n at 5, ECF No. 260. Rothschild & Co "authorized BNP SS to act as a custodian and agent of the EGA Fund and to place securities orders on its behalf . . . ." *Id.* Plaintiffs allege that Rothschild & Co "and Rothschild & Cie Banque" entered into a brokerage and custody agreement with BNP SS in 2004 (the "B&C Agreement"). *Id.*; Declaration of David Flugman in Support of Liquidators' Opposition ("Flugman Decl.") Ex. 4 at -1136, ECF No. 261 ("[Rothschild & Cie Bank], . . . hereby entrusts [BNP SS] with the safekeeping of the assets of the [EGA fund]."). The B&C Agreement allowed BNP SS, upon authorized instructions, to receive or deliver securities, to make or receive cash payments, and "more generally to dispose of Securities or Cash." *Id.* at -1141. An April 22, 2022, Letter from Defendant's counsel to Plaintiff's counsel explains that "BNP PARIBAS Securities Services functioned as the service provider at the time of [the transferring of shares from Sentry to Sigma] and the EGA Fund Redemption and placed orders on behalf of EGA Fund . . . ." Flugman Decl. Ex. 2, Apr. 2022 Zulack Letter at 3.

BNP SS, on behalf of Rothschild & Co, subscribed for 1,711.77 shares of Sentry in 2004 and 2005, and for 13,855.04 shares of Sigma in 2007. Opp'n at 10; Flugman Decl. Exs. 5–8. Defendant switched its shares of Sentry into shares of Sigma in May 2006, leaving it with

23,182.38 shares of Sigma.[5]  Opp'n at 10; Flugman Decl. Exs. 10–11 ("Your balance following this transaction will be 23,182.3764 voting shares."); *see also id.* Ex. 9 ("We would like to SWITCH all shares ( 1 711.77 . . .)on [sic] behalf of our client Rothschild et Cie Banque. In Fairfield Sentry USD Class, to Fairfield SIGMA EUR for the next dealing day . . . . Please ensure that this switch is registered under the following name: BNP PARIBAS SECURITIES SERVICES / ROTHSCHILD ET CIE BANQUE / EGA.").  In 2008, Defendant redeemed 23,182.38 shares of Sigma, worth approximately €4,514,478.02, or $5,651,675.03.  Opp'n at 1, 3, 6.  The Liquidators allege that BNP SS executed the relevant subscriptions and redemptions as the agent for the Defendant.  *Id.* at 17.

Bernard Madoff was arrested in violation of federal securities laws on December 11, 2008.  *Id.* ¶ 167.  The United States Attorney brought criminal charges against him, alleging that Madoff ran a Ponzi scheme.  *Id.*  On December 11, 2008, the Securities Exchange Commission filed an action in the Southern District of New York to halt the continued offerings of securities.  *Id.* ¶ 168.  In March 2009, Madoff pleaded guilty to criminal charges against him and confessed to operating a Ponzi scheme and fabricating statements and trade confirmations.  *Id.* ¶¶ 169–70.  Madoff was sentenced to 150 years in federal prison and died in April 2021.  *Id.* ¶ 171.

The Amended Complaint alleges that Rothschild & Co, through its agent "BNP Paribas SSL had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated" when the redemption payments were made.  *Id.* ¶ 183.  The Amended Complaint further asserts that between 1997 and 2008, BNP Paribas SSL "ascertained multiple indicia of

---

[5]    Because Defendant did not receive any redemptions from Sentry, unlike other defendants in matters before this Court in these Fairfield Funds proceedings, (*see, e.g., Fairfield Sentry Ltd. v. HSBC Private Bank Suisse S.A. (In re Fairfield Sentry Ltd.)*, No. 10-13164 (JPM), 2024 WL 61469, at *8 (Bankr. S.D.N.Y. Jan. 4, 2024)) Rothschild & Co is not alleged to have utilized correspondent accounts in the United States.  *See* Hr'g Tr. 127:15–21, ECF No. 315 ("Rothschild did not redeem from Fairfield Sentry . . . . This means that Rothschild did not employ a U.S. correspondent account in connection with its single redemption and the liquidators do not allege that the redemption was paid in or through a U.S. bank account, because it was not.").

fraud . . . leading it to believe that BLMIS was a fraud, and, therefore, that the Net Asset Value could not be accurate." *Id.* These indicia included the impossibility of validating trades and repeatedly ignoring the companies' own internal policies and procedures regarding potential fraud. *Id.* ¶¶ 184–87.

**B.**  **The Prior Litigation and Procedural History**

The Fairfield Funds were put into liquidation in the British Virgin Islands ("BVI") in 2009. *Id.* ¶¶ 26–28. The BVI court issued orders appointing the foreign representatives, Kenneth Krys and Greig Mitchell, as liquidators of the Fairfield Funds. *Id.* ¶ 28. Pursuant to the appointment order of the BVI court,[6] the "Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates." *Id.* ¶ 177. The Liquidators commenced actions in the BVI against a number of investors who had redeemed shares of the Fairfield Funds before the collapse of the scheme. Mem. L. at 7, ECF No. 177; *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475 (S.D.N.Y. 2022); *see also In re Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 284 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*").

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings. Am. Compl. ¶ 29. This Court granted that recognition on July 22, 2010. *Id.* All cases filed by the Plaintiffs were administratively consolidated before this Court in November 2010. *See* Consolidation Order, Adv. Pro. No. 10-03496, ECF No. 25.

---

[6]    The order was issued by the "Commercial Division of the Eastern Caribbean High Court of Justice." *See* Am. Compl. at 1.

The Plaintiffs asserted multiple causes of action in those consolidated adversary proceedings including, *inter alia*, mistaken payment and constructive trust.[7]  Compl. ¶¶ 61–84, ECF No. 6;  *see also* 630 F. Supp. 3d at 479.  In October 2011, this Court stayed the U.S. proceedings pending resolution of the BVI proceedings.  *See* Am. Order Staying Redeemer Actions, Adv. Pro. No. 10-03496, ECF No. 418.; *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *3 (Bankr. S.D.N.Y. Aug. 6, 2018).

In April 2014, the Privy Council affirmed dismissal of the Plaintiffs' BVI law claims for restitution based on mistaken payment.  *Fairfield Sentry Ltd. (In Liquidation ) v. Migani*, [2014] UKPC 9 ("*Migani* ").[8]  The Privy Council held that the Plaintiffs' claims for restitution in the BVI to recover redemption payments arising out of transactions governed by the Funds' Articles of Association are governed by BVI law.  *Id.* ¶ 17.  The Plaintiffs' claims to recover redemption payments thus depended on whether Sentry was bound to make those payments under the "true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or . . . the NAV per share which was determined by the Directors at the time of redemption."  *Id.* ¶ 19.  The Privy Council concluded that the NAV had to be definitively determined at the time of the subscription or redemption.  *Id.* ¶ 21.  The redemption payments made under the NAV were thus not subject to restitution and the payee was not unjustly enriched by receiving funds, even if the amount was mistaken.  *Id.* ¶¶ 18–19.

---

[7]      Other causes of action included unjust enrichment, money had and received, unfair preferences under BVI's Insolvent Act § 245, undervalue transactions under the Insolvent Act § 246, breach of contract, and breach of the implied covenant of good faith and fair dealing.  *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d at 463, (S.D.N.Y. 2022).

[8]      *Migani* is available at https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf and, without numbered paragraphs, on the Westlaw database at *Fairfield Sentry Ltd (In Liquidation) v Migani*, 2014 WL 1219748.

After *Migani* was issued, the Plaintiffs allegedly obtained evidence of bad faith of Citco, the Fairfield Fund's administrator, when it issued redemption certificates. *See In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2018 WL 3756343, at *5–6 (Bankr. S.D.N.Y. Aug. 6, 2018). Plaintiffs moved to amend the complaint, seeking to add allegations that Citco lacked good faith when it issued certificates for redemptions and was aware that the NAV was inflated at the time. *See id.* at *6. The Plaintiffs argued that the certificates would not be binding under the Funds' Articles if they were not issued in good faith. *Id.*

In December 2018, this Court found that the Plaintiffs could allege bad faith on behalf of Citco in the U.S. proceedings and could seek recovery of the redemption payments only "where a Defendant knew the NAV was inflated at the time of redemption." *Fairfield II*, 596 B.R. at 295. Of the common law claims, the Court allowed only the Plaintiffs' claims for constructive trust against the so-called 'Knowledge Defendants' to proceed. *Id.* at 301 ("The suggestion that the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the contract and requires restitution lacks support. The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust."). In December 2020, this Court ruled that § 546(e) bars Plaintiffs' BVI avoidance claims to recover unfair preferences and undervalue transactions. *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *1 (Dec. 14, 2020) ("*Fairfield III*").

Following these decisions, only the constructive trust claims survived. *Id.*; *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2021 WL 771677, at *1 (Bankr. S.D.N.Y. Feb. 23, 2021) ("*Fairfield IV*"), *aff'd*, 630 F. Supp. 3d 463. The Liquidators filed a further motion to amend the complaints against the Knowledge Defendants. Mot. to Amend, ECF No. 133; Mot. to Amend,

Adv. Pro. No. 10-03496, ECF No. 3737.  On August 5, 2021, this Court granted the motion to

amend the complaint and lifted the stay of the redeemer actions.  Order Granting Mot. to Amend,

ECF No. 142; Order Lifting Stay of Redeemer Actions, ECF No. 141.

### C. <u>The Pending Motion</u>

The Amended Complaint seeks the imposition of a constructive trust on the redemption

payments received from the Fairfield Funds.  Am. Compl. ¶ 179, ECF No. 143.  The Amended

Complaint alleges that BNP Paribas SS had knowledge of the fraud at BLMIS and therefore

knowledge that the NAV was inflated.  *Id.* ¶ 183–88.  "By reason of their receipt of some or all

of the Redemption Payments, Defendants[9] have been unjustly enriched to the detriment of Sentry

and Sigma and other shareholders and creditors of Sentry and Sigma."  *Id.* ¶ 190.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts

recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully

blinds himself to that fact."  *Id.* ¶ 180 (citing 596 B.R. at 293).  As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the
> BVI, 'the plaintiff must show, first, a disposal of his assets in breach of fiduciary
> duty; second, the beneficial receipt by the defendant of assets which are traceable
> as representing the assets of the plaintiff; and third, knowledge on the part of the
> defendant that the assets he received are traceable to a breach of fiduciary duty.'

*In re Fairfield Sentry Ltd.*, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) (quoting *El Ajou*

*v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

The Amended Complaint alleges that the defendants, including Rothschild & Co as a

beneficial shareholder of BNP accounts, purposefully availed themselves of the laws of the

United States and the State of New York by "investing money with the Funds, knowing and

---

[9]    As stated *supra* page 3, footnote 3, the Amended Complaint alleges that several other defendants may have
received redemption payments made to BNP Paribas SSL.  *Id.* ¶¶ 35–44.

intending that the Funds would invest substantially all of that money in New York-based BLMIS . . . ." Am. Compl. ¶ 20, ECF No. 143.

The parties engaged in personal jurisdiction discovery between September 2021 and August 2022. *See* Second Am. Scheduling Order, ECF No. 223. *Id.* Fact discovery is ongoing in this case. *See* Eighth Am. Scheduling Order, ECF No. 305.

Defendant has moved to dismiss the Amended Complaint for lack of personal jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts with the forum to establish personal jurisdiction over Defendant and that exercising personal jurisdiction would be unreasonable. *See* Mem. L. at 4–6, ECF No. 177.

The Liquidators filed an opposition to the Motion and submitted the declaration of David Flugman in support of their opposition. Opp'n, ECF No. 260; Declaration of David Flugman in Support of Liquidators' Opposition ("Flugman Decl."), ECF No. 261.[10] The Liquidators argue that exercising jurisdiction over Rothschild and Co would be reasonable and that Defendant's contacts with the United States in knowingly and intentionally investing in the Fairfield Funds, due diligence, and communications with U.S. offices of the manager of the Fairfield Funds support personal jurisdiction. Opp'n at 2–4, ECF No. 260. Defendant filed a reply memorandum on August 9, 2023. Reply, ECF No. 284. This Court reviewed the above filings and held a hearing on the Motion on May 7, 2024. *See* Hr'g Tr., ECF No. 315.

---

[10]     Pursuant to various orders of this Court, portions of certain filings and supporting documents were filed under seal. At the Hearing on the motion, the Court gave the parties the opportunity to withdraw from the record any previously-sealed materials that the party did not want to be cited, quoted, or otherwise referenced in the opinion. Hr'g Tr. 12:5–17, ECF No. 315. Neither party in this matter requested information withdrawn. The Court will nevertheless refrain from referring to any bank account numbers  or names of any individual employees in sealed documents in full.

## IV.    DISCUSSION

### A.  The Law of Personal Jurisdiction

In order to subject a defendant to personal jurisdiction in the United States, due process requires that the defendant have sufficient minimum contacts with the forum in which the defendant is sued "'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "In adversary proceedings, courts must determine whether the defendant has minimum contacts with the United States, rather than with the forum state."  *Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021) (citing *In re Lehman Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)).  "When jurisdiction is satisfied through Bankruptcy Rule 7004,[11] a bankruptcy court need not address its state's long-arm statute."  *Id.* n.12; *see also Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 630 (4th Cir. 1997).

An analysis of minimum contacts "focuses on the relationship among the defendant, the forum, and the litigation," a relationship that "must arise out of contacts that the defendant himself creates with the forum State."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations omitted).  There are three conditions necessary for the Court to exercise specific jurisdiction[12] over the non-resident defendant:

---

[11]    "The summons and complaint and all other process except a subpoena may be served anywhere in the United States." Fed. R. Bankr. P. 7004(d).  A bankruptcy court may exercise personal jurisdiction over a defendant served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States." Fed. R. Bankr. P. 7004(f).

[12]    Courts recognize "two types of personal jurisdiction: general and specific jurisdiction.  A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State."  *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. -----, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)).  The

First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State. Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct. Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(2), the Plaintiff "must make a prima facie showing that jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)). A trial court has considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2). *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies depending on the procedural posture of the litigation." *Id.* (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Following discovery, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball*, 902 F.2d at 197. "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction.'" *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL 5016884, at *4 (S.D.N.Y. June 30, 2023) (quoting *Dorchester Fin. Sec.*, 722 F.3d at 85). "Now

---

Plaintiffs do not allege that the Court has general jurisdiction over Defendant. *See* Mem. L. at 10, ECF No. 177 ("Plaintiffs do not allege that the Court has general jurisdiction over this French Defendant, which is not "at home" in the United States, and so Plaintiffs must plead facts supporting the exercise of specific jurisdiction over Defendant."); Opp'n at 2 (arguing that the Court's specific jurisdiction is founded on Defendant's contacts with the forum that relate to the claims at issue).

that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy." 2023 WL 5016884, at *6 (citing 722 F.3d at 85). "Plaintiffs need only show that their prima facie showing of jurisdiction is factually supported." *Id.* at *6. When considering a motion to dismiss before or after jurisdictional discovery has taken place, "the court must 'construe the pleadings and affidavits in the light most favorable to plaintiffs,' and resolve all doubts, including factual disputes, in the plaintiff's favor." *Id.* at *4 (quoting *Ball*, 902 F.2d at 197).

## B. <u>Analysis of Purposeful Availment</u>

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013)). For specific personal jurisdiction, "'[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit,' and the plaintiff's claim must in some way 'arise from the defendant's purposeful contacts with the forum.'" *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)). "Although a defendant's contacts with the forum state may be 'intertwined with [its] transactions or interactions with the plaintiff or other parties . . . [,] a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction.'" *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*, 571 U.S. at 134) (alteration in original). "It is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *Id.*

Defendant asserts that "according to the Plaintiffs' own allegations, every relevant and material aspect of the claims . . . is foreign" and that the "Plaintiffs have elsewhere, when it has served their purposes, adopted" allegations showing the foreignness of the claims. Mem. L. at 2–3, ECF No. 177. Defendant points to the Plaintiffs' arguments before the District Court, wherein Plaintiffs argued that "every relevant component of the transactions at issue here occurred outside the territorial jurisdiction of the United States." *Id.* at 3; *see also* Pls.-Appellants' Opening Br. for Second Round Appeal at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (S.D.N.Y. July 21, 2021), ECF No. 440 (the "Opening Brief"). The Plaintiffs' Opening Brief concerned the extraterritorial application of the § 546(e)[13] safe harbor. *See* Opening Brief at 24. (arguing that the "Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply extraterritorially to shield from avoidance settled securities transactions that occurred exclusively outside the United States.").

As another bankruptcy court in this district has stated, the "tests for personal jurisdiction and extraterritoriality are not the same." *Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Israel Corp.)*, 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017). In *Spizz*, the bankruptcy court was able to simultaneously find that the "[t]ransfer was not domestic, and hence, cannot be avoided" under § 547, while also clarifying that by "attend[ing] meetings in New York around the time of, and apparently in conjunction with, the commencement of the chapter 11 case," a defendant may be "subject to specific personal jurisdiction." *Id.* at 613–14.

---

[13]    Section 546(e) of the Bankruptcy Code prohibits a trustee from avoiding a transfer that is a margin payment or settlement payment "made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract. . . ." 11 U.S.C. § 546(e). "By its terms, the safe harbor is a defense to the avoidance of the *initial* transfer." *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original).

By arguing in the District Court that the redemption transfers were foreign for purposes of extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum for purposes of personal jurisdiction.  To determine whether a transaction is foreign or domestic for analyzing extraterritoriality issues for federal statutes, courts look at whether the "conduct relevant to the statute's focus occurred in the United States."  *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 326, 136 S. Ct. 2090, 2094, 195 L. Ed. 2d 476 (2016).  To determine whether personal jurisdiction is appropriate, however, courts analyze a defendant's contacts with the forum "under a totality of the circumstances test."  *Licci*, 732 F.3d at 170 (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).

### 1.  Defendant's Business Contacts with the Forum

The Liquidators assert that Defendant "intentionally invested in BLMIS feeder funds Sentry and Sigma with the express intention of profiting from BLMIS's investments in the U.S. securities market" and "knowing that the Funds were designed to subsequently invest that money in New York-based BLMIS."  Opp'n at 15, ECF No. 260.  Defendant describes the allegations that it knew the subscription payments into the Fairfield Funds would be invested in BLMIS in New York as "entirely unrelated to Defendant" and the unilateral activity of a third-party foreign administrator of the Funds, which Defendant argues is not appropriate to consider under *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984).  *See* Mem. L. at 10–11, ECF No. 206.

In *Helicopteros*, the Supreme Court found that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions."  *Helicopteros*, 466 U.S. at 418.  The Supreme Court found that "one trip" to the forum "for the

purpose of negotiating the transportation-services contract . . . cannot be described or regarded as a contact of a 'continuous and systematic' nature . . . ." *Id.* at 416. The Liquidators, however, have described more substantial contacts here.

First, the Liquidators point to the documents given to the EGA Fund before and throughout the relevant period of investment, which documents "made clear that the main purpose of the Funds' existence was to invest in BLMIS, a New York-based broker dealer registered in the U.S., in order to invest in U.S. securities markets and U.S. Treasury Bills." Opp'n at 9, ECF No. 260. In August 2018, this Court held that it does not have personal jurisdiction over certain defendants due to subscription agreements that provided for consent to jurisdiction in New York for claims "with respect to [the Subscription] Agreement and the Fund." *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *11 (Bankr. S.D.N.Y. Aug. 6, 2018). The Liquidators here rely on the documents not to show consent, but to show that when Defendant invested in the Fairfield Funds, it did so knowing that it would avail itself of the benefits and protections of New York. Opp'n at 25–26. The subscription agreements, in this way, support the Plaintiffs' showing of contacts with the forum.

In addition, Defendant received memoranda at the time it subscribed into the Fairfield Funds that explained the objective of Sentry was to "achieve capital appreciation of its assets principally by allocating its assets to an account at Bernard L. Madoff Investment Securities, Inc. . . . which employs an options trading strategy describe[d] as 'split strike conversion.'" Flugman Decl. Ex. 35 at -555–556, ECF No. 261; *see also id.* Ex. 38 at -744 ("All of the [Sigma] Fund's 'split strike conversion' assets are custodied at Bernard L. Madoff Securities."). The Fairfield Funds would allocate no more than 5% in aggregate of its net asset value in investments other than BLMIS's split strike conversion strategy. *Id.* at -738. The memoranda identified BLMIS as

the "sub-custodian of the Fund." *Id.* Ex. 35 at -565. These documents show that Defendant was aware at the time that its investments in the Fairfield Funds were effectively investments in BLMIS in New York.

Second, evidence shows that Defendant was in communication via email with the manager of the Fairfield Funds in New York, the Fairfield Greenwich Group, regarding investments with the Fairfield Funds. Hr'g Tr. 128:10–17 (stating that the Liquidators submitted 21 emails "between Fairfield and Rothschild personnel," of which four "appear to be with Fairfield personnel in the U.S."); *see also* Flugman Decl. Exs. 41–42 (emails received by Defendant from sender with "@fggus.com" email address). These contacts demonstrate demonstrated facts showing continuous and systemic contacts with the forum.

### 2.  Whether the Defendant's Contacts are Otherwise Appropriate to Support the Court's Exercise of Personal Jurisdiction

The Court will address Rothschild & Co's arguments that its alleged contacts are not jurisdictionally relevant under Supreme Court precedent. Mem. L. at 22–23, ECF No. 177; Reply at 10–11, ECF No. 284. Defendant argues that the Plaintiffs' allegations amount to "mere knowledge that Sentry would invest money it raised in the BVI with BLMIS in New York," which it states is "insufficient as a matter of law to support jurisdiction" under *Walden v. Fiore*, 571 U.S. 277 (2014). Mem. L. at 13.

In *Walden*, the Supreme Court found that a defendant "formed no jurisdictionally relevant contacts" with the forum state of Nevada as "[p]etitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Walden*, 571 U.S. at 289. The Supreme Court further stated that it is impermissible to allow the "plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.* As the Supreme Court explained, the "plaintiff cannot be the only link between the defendant and the forum," and

"the defendant's conduct . . . must form the necessary connection with the forum State." *Id.* at 285. Nevertheless, personal jurisdiction may be found even where a "defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties." *Id.* at 286.

The Plaintiffs' allegations and supporting evidence of intentional investment into BLMIS in New York and interactions with the Fairfield Funds, as described above, demonstrate that Rothschild & Co took affirmative actions on its own apart from the conduct of the Plaintiffs. *See, e.g.,* Am. Compl. ¶¶ 11–12, ECF No. 143; Opp'n at 23, ECF No. 260 ("Liquidators do not argue . . . that EGA is subject to jurisdiction because of the Funds' own contacts with the U.S. . . . Rather . . . EGA instructed BNP SS to invest in Madoff feeder funds with the *express aim* of having those investments placed with a U.S.-based investment fund to take advantage of the U.S. securities markets and while knowing that the Funds were *contractually required* to invest at least 95% of the money they received in U.S.-based BLMIS.").

The Liquidators have shown that the Defendant knew and intended that by investing in the Funds, its own money would enter into U.S.-based BLMIS. Am. Compl. ¶ 20; Opp'n at 2. This certainty can be found in the Fairfield Funds' contractual obligation to invest at least 95% of the money they received in U.S.-based BLMIS. *See* Flugman Decl. Ex. 39, ECF No. 261 (disclosing that over 95% of assets invested would be invested in Madoff's split-strike strategy).

The Plaintiffs further argue that Defendant conducted "extensive due diligence on the Funds prior to and during the Subscription Period—including conducting internal audits; requesting and receiving the Funds' financial statements, NAVs, strategy reports, weekly fund reports, tear sheets, and due diligence questionnaires . . . ." Opp'n at 20, ECF No. 260. In one email produced by Defendant, an employee of the Fairfield Greenwich Group with "fggus.com"

email address provides Defendant with Sentry's private placement memorandum and a due
diligence questionnaire in response to a question about the Fairfield Funds' decision-making
processes. Flugman Decl. Ex. 36 at -273. The due diligence questionnaire that Defendant
received described dependence on "Principals and Key Employees of the Manager and Bernard
L. Madoff Investment Securities" and stated that Sentry's strategy is to focus "on the most liquid
US stocks, the S&P 100. Although the strategy may be applied to other geographical markets,
the platform advantage of operating in the S&P stocks may not be easily replicated in other
regional markets." *Id.* at -344. A January 2004 email from a FGG employee with "@fggus.com"
email address to an employee with an "@fr.rothschild.com" email address provided Defendant
with a monthly fund performance statement. *Id.* Ex. 21; *see also id.* Exs. 41–42 (emails from
"@fggus.com email address to providing further monthly performance statements). In another
email, an FGG employee with "fgguk.com" email address responds to an employee with an
"@fr.rothschild.com" email address following a "telephone conversation . . . regarding the
Fairfield Sentry/Sigma fund" by providing Defendant with a presentation, a Sigma tearsheet
from June 2005, a due diligence questionnaire, and a Libor analysis. *Id.* Ex. 39. Defendant
allegedly met with a FGG employee in Paris to discuss due diligence on Fairfield Sentry and
planned a trip to New York to meet with other FGG employees. *Id.* Exs. 13–14. One employee
of EGA met with a FGG employee in Paris where the two discussed how the fund was "different
from other managed accounts at Madoff." *Id.* Ex. 16. The relevant contacts were not driven by
the conduct of the Fairfield Funds alone; they were the result of Defendant's efforts to invest in
BLMIS in New York.

Defendant next argues that the Liquidators' evidence of Defendant's contacts with the
United States amount to little more than the stream of commerce theory rejected by *J. McIntyre*

*Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882–86 (2011), where the Court stated that "it is not enough that [a] defendant might have predicted that its goods will reach the forum," but rather the defendant must "engage[] in conduct purposefully directed at [the forum]." Mem. L. at 15, ECF No. 177. The Liquidators argue that the Defendant did not merely expect that the investments would reach the United States, but rather that Defendant's express purpose of investing in the Fairfield Funds was to invest with BLMIS in New York. Opp'n at 15, ECF No. 260 ("EGA intentionally invested in BLMIS feeder funds Sentry and Sigma, knowing that the Funds were designed to subsequently invest that money in New York-based BLMIS. EGA is subject to this Court's jurisdiction with respect to its Sigma redemption as a result of that conduct."). This conduct was purposefully directed at the forum.

This Court thus finds that Defendant's investments into the Fairfield Funds and its communications and meetings concerning investments with BLMIS in New York support the Court's exercise of jurisdiction over claims for receiving redemption payments from Sigma with the knowledge that the NAV was wrong. The contacts are not random, isolated, or fortuitous. The contacts demonstrate Rothschild & Co's purposeful activities aimed at New York in order to effectuate the relevant transfers. The Plaintiffs have thus provided facts that sufficiently support a prima facie showing of jurisdiction over the Defendant.

**C. Whether the Claim Arises Out of or Relates to the Defendant's Forum Conduct**

The suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. ----, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (emphasis in original). "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required. *Id.* at 1027. Instead, a court need only find "an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires*

*Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Defendant argues that the claims "here are not about, and do not arise out of, any investment with BLMIS." Mem. L. at 4, ECF No. 177. However, the Liquidators seek imposition of a constructive trust on funds received with knowledge that the NAV was inflated. Am. Compl. ¶¶ 179–80, No. 143. The issue of knowledge of the inflated NAV is inextricably tied to the Defendant's investments with New York-based BLMIS. The allegations are directly related to Defendant's investment activities with BLMIS through the Fairfield Funds. The Defendant's contacts with the United States, in investing in and in communications with the Fairfield Funds, form a "sufficiently close link" between the defendant, the forum and the litigation concerning Defendant's activities in the forum. *See MSP Recovery Claims, Series LLC v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773, at *3 (S.D.N.Y. Sept. 29, 2021) (quoting *Ford Motor Co.*, 141 S. Ct. at 1032).

### D. <u>Whether Assertion of Personal Jurisdiction is Reasonable</u>

If a defendant has sufficient minimum contacts, the Court must then ask "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Where the plaintiff "makes the threshold

showing of the minimum contacts required for [exercising personal jurisdiction], a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3 (quoting *Bank Brussels Lambert*, 305 F.3d at 129). Factors the Court will consider include the burden on the defendant; the interests of the forum in adjudicating the case; the plaintiff's interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the states in furthering fundamental substantive social policies. 305 F.3d at 129.

The Defendant argues that "the United States' interest in adjudicating this dispute is minimal at best. The dispute is between foreign parties arising under foreign law pursuant to a foreign contract for the return of cash sent between two foreign countries in a purely foreign transaction." Mem. L. at 24, ECF No. 177. Defendant further argues that the proceeding is non-core, ancillary, and only tenable due to Chapter 15 recognition. *Id.* (citing *In re Fairfield Sentry Ltd.*, 458 B.R. 665, 682 (S.D.N.Y. 2011) (Preska, J.)).

Defendant's reliance on *In re Fairfield Sentry Ltd.*, 458 B.R. 665, is misplaced. In that case, the District Court determined whether the proceeding was core or non-core; it did not determine whether adjudication or jurisdiction in the United States was reasonable. *See id.* at 675. Further, the Court has already found that it has subject matter jurisdiction over these proceedings. *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *8 (Bankr. S.D.N.Y. Aug. 6, 2018). Chapter 15 allows for recognition of Sentry's foreign main proceeding. 11 U.S.C. § 1501(a) ("The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency . . . ."); id. § 1504 ("A case under this chapter is commenced by the filing of a

petition for recognition of a foreign proceeding under section 1515.").  Defendant correctly states

that cases brought under Chapter 15 are ancillary to foreign proceedings.  2018 WL 3756343, at

*2.  The ancillary character of such cases does not necessarily mean that the United States has

minimal interest in the dispute.

Defendant argues it is burdened by the potential exposure to civil and criminal liability.

Mem. L. at 25.  In support of this argument, Defendant cites to a ruling in which the Court

granted in part and denied in part a motion seeking relief as to the order staying the action and

seeking expedited initial disclosures on beneficial holders.  *Id.*; *see* Bench Ruling, Adv. Pro. No.

10-03496, ECF No. 799 (the "July 2012 Bench Ruling").  This Court based that ruling on a

comity analysis in light of the then-uncertain "offshore underpinnings for this litigation in its

entirety."  *Id.* at 2.  The Court stated in that ruling that it was "hard-pressed to find any

compelling United States' interest in mandating discovery here *at this juncture* of the pending

litigation."  *Id.* (emphasis added).

Defendant has not shown that the interests at stake in that proceeding over ten years ago,

are the same as those at stake now.  Although defendants were previously able to identify

specific laws in foreign countries that would have been broken by complying with the Court's

prior order, Rothschild & Co now only describes a potential exposure to liability.  *See* Mem. L.

at 25.  This Court lifted the stay and required the Defendant to proceed to discovery in 2021.

Order Lifting Stay, ECF No. 141; Scheduling Order, ECF No. 155.  The July 2012 Bench Ruling

shows that this Court is capable of alleviating specific burdens identified by a defendant.  The

mere potential for exposure to unspecified liability is not a burden which renders exercise of

jurisdiction unreasonable.

Defendant argues that "Plaintiffs have not demonstrated that it is more reasonable for them to litigate their claims against Defendant in New York rather than in the BVI . . . or in France . . . ." Mem. L. at 25. Defendant suggests that the Liquidators may be engaged in forum-shopping through "strategic maneuvering." *Id.* at 26. Defendant states that there is a burden placed on litigating in the forum as the "witnesses and evidence in this action are all overseas . . . ." *Id.* at 6; Reply at 12, ECF No. 284.

The Defendant has demonstrated that this Court's exercise of jurisdiction over it may impose a minimal burden in terms of requiring it to "traverse the distance" to the forum. However, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010); *see also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023).

Rothschild & Co has participated in this litigation for nearly five years and is represented by U.S. counsel. *See, e.g.,* Notice of Appearance, ECF No. 87. Furthermore, the United States has a strong interest in ensuring the integrity of its financial systems.

Defendant has alleged that other forums may be able to hear the claims. What it has not done is demonstrate how this forum would fail to provide effective relief. *See MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3. Defendant does not explain what interest is impaired by precluding adjudication in another forum or why that interest outweighs other factors in favor of exercising jurisdiction. *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 22 CIV. 6561 (LGS), 2023 WL 395225, at *6 (S.D.N.Y. Jan. 25, 2023). The Defendant has not

established that the Court's exercise of personal jurisdiction over it would be unreasonable.  The

Court thus finds that exercising jurisdiction over the Defendant is reasonable and comports with

"traditional notions of fair play and substantial justice . . . ."  *See Int'l Shoe*, 326 U.S. at 316, 66

S.Ct. 154.

## V.  **CONCLUSION**

For the foregoing reasons, the Court DENIES the Defendant's Motion to Dismiss the

Amended Complaint.  The Liquidators shall submit a proposed order consistent with the findings

in this decision in accordance with Local Bankruptcy Rule 9074-1(a).

**IT IS SO ORDERED.**


Dated: New York, New York
       June 11, 2024

                                        /S/ John P. Mastando III_____
                                        THE HONORABLE JOHN P. MASTANDO III
                                        UNITED STATES BANKRUPTCY JUDGE