UNITED STATES BANKRUPTCY COURT                    *FOR PUBLICATION*

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>Fairfield Sentry Limited, et al.<br><br><div align="center">Debtors in Foreign Proceedings.</div> | Chapter 15<br><br>Case No. 10-13164 (JPM)<br><br>(Jointly Administered) |
| FAIRFIELD SENTRY LTD. (In Liquidation), et al.,<br><br><div align="center">Plaintiffs,</div><br>v.<br><br>BNP PARIBAS SECURITIES SERVICES LUXEMBOURG, et al.,<br><br><div align="center">Defendants.</div> | Adv. Pro. No. 10-03627 (JPM) |

<div align="center">

**MEMORANDUM OPINION AND ORDER DENYING
DEFENDANT'S MOTION TO DISMISS**

</div>

*APPEARANCES:*

**WINSTON & STRAWN LLP**
Counsel for *Altipro Master Fund*:
1901 L Street, N.W.
Washington D.C. 20036
By:    Keith R. Palfin
        Heather Lamberg


**BROWN RUDNICK LLP**
*Attorneys for the Plaintiffs Joint Liquidators*
Seven Times Square
New York, NY 10036
By:    Jeffrey L. Jonas
        David J. Molton
        Marek P. Krzyzowski

JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE

## I.    INTRODUCTION

Pending before the Court is the motion of the Defendant, Altipro Master Fund ("Altipro" or "Defendant"), sued as Altigefi-Altipro Master a/k/a Olympia Capital Management, to dismiss the Fifth Amended Complaint (the "Amended Complaint") for lack of personal jurisdiction. Mot. to Dismiss, ECF[1] No. 171.  The Court held a hearing on the Motion to Dismiss on May 3, 2024 (the "Hearing").  For the reasons set forth herein, the Court DENIES the Defendant's Motion to Dismiss.

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).  This Court previously concluded that it has subject matter jurisdiction over this and related actions.  *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018); *see also* Stip. Order, ECF No. 116.  Personal jurisdiction is contested by the Defendant and will be discussed below.

## III.    BACKGROUND

This adversary proceeding was filed on September 20, 2010.  Compl., ECF No. 1. Kenneth M. Krys and Greig Mitchell (the "Liquidators"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation) ("Sentry") and Fairfield Sigma Limited (In Liquidation) ("Sigma" and, together with Sentry, the "Fairfield Funds") filed the Amended Complaint on August 11, 2021.  Am. Compl., ECF No.

---

[1]    Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 10-03627-jpm unless otherwise noted.

143.  Via the Amended Complaint, the Liquidators seek the imposition of a constructive trust

and recovery of nearly $47 million allegedly received by BNP Paribas Securities Services

Luxembourg ("BNP Paribas SSL") and Beneficial Owners of the Accounts Held in the Name of

BNP Paribas Securities Services Luxembourg (the "Beneficial Owners").  *Id.* ¶¶ 1, 34.  Of that

amount, Defendant allegedly received at least $15,290,993 million through a redemption

payment from its investment in Sentry.  Opp'n at 1, ECF No. 277.[2]

## A.  **The BLMIS Ponzi Scheme**

This adversary proceeding arises out of the decades-long effort to recover assets of the

Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme.[3]  Am. Compl. ¶ 1.

BNP Paribas SSL allegedly invested, either for its own account or for the account of others, into

several funds, including Sentry and Sigma, that channeled investments into BLMIS.  *Id.* ¶¶ 2, 5,

16.

Fairfield Sentry was a direct feeder fund in that it was established for the purpose of

bringing investors into BLMIS, thereby allowing Madoff's scheme to continue.  *Id.* ¶¶ 5; 46–47;

*see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools

money from numerous investors and then places it into a 'master fund' on their behalf. A master

fund—what Madoff Securities advertised its funds to be—pools investments from multiple

feeder funds and then invests the money.").  Fairfield Sigma, in contrast, was an indirect feeder

---

[2]     At the time of the filing of the Fifth Amended Complaint, the Plaintiffs made no specific allegations as to
the exact amounts received by any of the Beneficial Owners.  With respect to Altipro, the Amended Complaint
states in relevant part that "[b]ased on Sentry and Sigma records, some or all of the Redemption Payments made to
BNP Paribas SSL may have been paid to an account holder or holders associated with the Beneficial Shareholder,
Altigefi-Antipro Master a/k/a Olympia Capital Management." Am. Compl. ¶ 39.  The Amended Complaint alleges
that several other defendants may have received redemption payments made to BNP Paribas SSL.  *Id.* ¶¶ 35–44.
This opinion concerns only those payments that the Plaintiffs allege were paid to Altipro.

[3]     The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff.  Details of that
scheme have been recounted by many courts.  *See, e.g., In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818
F. App'x 48 (2d Cir. 2020).

fund, established to facilitate investment in BLMIS through Fairfield Sentry for foreign currency. Am. Compl. ¶¶ 46–47.  BLMIS used investments from feeder funds, like the Fairfield Funds, to satisfy redemption requests from other investors in the scheme.  *Id.* ¶¶ 6–8, 14.  Without new investors, BLMIS would have been unable to make payments to those who chose to withdraw their investments, and the scheme would have fallen apart.  *Id.* ¶¶ 7–8, 13–15, 47, 50–52.

The Amended Complaint alleges that investors received payments on account of their shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV").  *Id.* ¶ 7.  BNP Paribas SSL is allegedly "one such investor."  *Id.*  To calculate the NAV, administrators used statements provided by BLMIS that showed "securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry."  *Id.* ¶ 49.  In fact, no securities were ever bought or sold by BLMIS for Sentry, and none of the transactions on the statements ever occurred.  *Id.* ¶ 50.  The money sent to BLMIS by the Fairfield Funds for purchase of securities was instead used by Bernard Madoff to pay other investors or was "misappropriated by Madoff for other unauthorized uses."  *Id.*  The NAVs were miscalculated, and redemption payments were made in excess of the true value of the shares.  *Id.* ¶ 53.  The Fairfield Funds were either insolvent when the redemption payments were made or were made insolvent by those payments.  *Id.* ¶ 52.

BNP Paribas SSL is a corporate entity organized under the laws of Luxembourg with a registered address in Luxembourg.  BNP Paribas SSL is an affiliate and subsidiary of its ultimate parent entity, BNP Paribas S.A. (collectively the "BNP Companies").  Am. Compl. ¶ 59.  BNP Paribas S.A. is described as a "banking and financial services conglomerate with headquarters in Paris, France, and offices in New York, New York."  *Id.*  BNP Paribas SSL is  a bank that invested in one of many BLMIS feeder funds for itself or others.  *Id.* ¶ 2.

Defendant is a corporate entity organized under the laws of France with a registered address in Paris, France. *Id.* ¶ 39. Defendant alleges that it was a *fonds commun de placement*,[4] represented by its portfolio management company, Olympia Capital Management SA. Mem. L. at 1, ECF No. 172. In a May 2022 letter to former counsel for the Plaintiffs, Defendant's counsel explained that Altipro "does not have independent legal status or employees of its own; it can only act in legal matters through, and as represented by, its portfolio management company." Declaration of David Molton in Support of Liquidators' Opposition ("Molton Decl.") Ex. 1 at 2, ECF No. 278. Counsel further stated that Altipro is a "diversified fund of funds investing in many funds" and that it does not buy or sell long-term investments. *Id.*

Defendant is alleged to have retained BNP Paribas Securities Services, S.A. ("BNP SS") as its agent to invest in and recover redemption payments from Sentry. Opp'n at 2. From 2005 to 2007, Defendant allegedly subscribed through BNP SS for 19,507.62 shares of Sentry. *Id.*

Bernard Madoff was arrested in violation of federal securities laws on December 11, 2008. Am. Compl. ¶ 167. The United States Attorney brought criminal charges against him, alleging that Madoff ran a Ponzi scheme. *Id.* On December 11, 2008, the Securities Exchange Commission filed an action in the Southern District of New York to halt the continued offerings of securities. *Id.* ¶ 168. In March 2009, Madoff pleaded guilty to criminal charges against him and confessed to operating a Ponzi scheme and fabricating statements and trade confirmations. *Id.* ¶¶ 169–70. Madoff was sentenced to 150 years in federal prison and died in April 2021. *Id.* ¶ 171.

---

[4]    Altipro has described itself as "a special type of fund under French law (*a fonds de placement*) that does not have independent legal status or employees of its own . . . ." Molton Decl. Ex. 1 at 2, ECF No. 278. The Court notes that one recent decision by the District Court has stated that such entities are investment funds. *See Star Colbert v. Dougan*, No. 23-CV-7297, 2024 WL 1197863, at *8 (S.D.N.Y. Mar. 20, 2024).

The Amended Complaint alleges that Defendant, through its agent "BNP Paribas SSL had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated" when the redemption payments were made. *Id.* ¶ 183. The Amended Complaint further asserts that between 1997 and 2008, BNP Paribas SSL "ascertained multiple indicia of fraud . . . leading it to believe that BLMIS was a fraud, and, therefore, that the Net Asset Value could not be accurate." *Id.* These indicia included the impossibility of validating trades and repeatedly ignoring the companies' own internal policies and procedures regarding potential fraud. *Id.* ¶¶ 184–87.

**B.  <u>The Prior Litigation and Procedural History</u>**

The Fairfield Funds were put into liquidation in the British Virgin Islands ("BVI") in 2009. *Id.* ¶¶ 26–28. The BVI court issued orders appointing the foreign representatives, Kenneth Krys and Greig Mitchell, as liquidators of the Fairfield Funds. *Id.* ¶ 28. Pursuant to the appointment order of the BVI court,[5] the "Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates." *Id.* ¶ 177. The Liquidators commenced actions in the BVI against a number of investors who had redeemed shares of the Fairfield Funds before the collapse of the scheme. Mem. L. at 7, ECF No. 177; *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475 (S.D.N.Y. 2022); *see also In re Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 284 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*").

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings.

---

[5]    The order was issued by the "Commercial Division of the Eastern Caribbean High Court of Justice." *See* Am. Compl. at 1.

Am. Compl. ¶ 29.  This Court granted that recognition on July 22, 2010.  *Id.*  All cases filed by the Plaintiffs were administratively consolidated before this Court in November 2010.  *See* Consolidation Order, Adv. Pro. No. 10-03496, ECF No. 25.

The Plaintiffs asserted multiple causes of action in those consolidated adversary proceedings including, *inter alia*, mistaken payment and constructive trust.[6]  Compl. ¶¶ 61–84, ECF No. 6;  *see also* 630 F. Supp. 3d at 479.  In October 2011, this Court stayed the U.S. proceedings pending resolution of the BVI proceedings.  *See* Am. Order Staying Redeemer Actions, Adv. Pro. No. 10-03496, ECF No. 418.; *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *3 (Bankr. S.D.N.Y. Aug. 6, 2018).

In April 2014, the Privy Council affirmed dismissal of the Plaintiffs' BVI law claims for restitution based on mistaken payment.  *Fairfield Sentry Ltd. (In Liquidation ) v. Migani*, [2014] UKPC 9 ("*Migani* ").[7]  The Privy Council held that the Plaintiffs' claims for restitution in the BVI to recover redemption payments arising out of transactions governed by the Funds' Articles of Association are governed by BVI law.  *Id.* ¶ 17.  The Plaintiffs' claims to recover redemption payments thus depended on whether Sentry was bound to make those payments under the "true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or . . . the NAV per share which was determined by the Directors at the time of redemption."  *Id.* ¶ 19.  The Privy Council concluded that the NAV had to be definitively determined at the time of the subscription or redemption.  *Id.* ¶ 21.  The redemption payments

---

[6]     Other causes of action included unjust enrichment, money had and received, unfair preferences under BVI's Insolvent Act § 245, undervalue transactions under the Insolvent Act § 246, breach of contract, and breach of the implied covenant of good faith and fair dealing.  *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d at 463, (S.D.N.Y. 2022).

[7]     *Migani* is available at https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf and, without numbered paragraphs, on the Westlaw database at *Fairfield Sentry Ltd (In Liquidation) v Migani*, 2014 WL 1219748.

made under the NAV were thus not subject to restitution and the payee was not unjustly enriched by receiving funds, even if the amount was mistaken. *Id.* ¶¶ 18–19.

After *Migani* was issued, the Plaintiffs allegedly obtained evidence of bad faith of Citco, the Fairfield Fund's administrator, when it issued redemption certificates. *See In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2018 WL 3756343, at *5–6 (Bankr. S.D.N.Y. Aug. 6, 2018). Plaintiffs moved to amend the complaint, seeking to add allegations that Citco lacked good faith when it issued certificates for redemptions and was aware that the NAV was inflated at the time. *See id.* at *6. The Plaintiffs argued that the certificates would not be binding under the Funds' Articles if they were not issued in good faith. *Id.*

In December 2018, this Court found that the Plaintiffs could allege bad faith on behalf of Citco in the U.S. proceedings and could seek recovery of the redemption payments only "where a Defendant knew the NAV was inflated at the time of redemption." *Fairfield II*, 596 B.R. at 295. Of the common law claims, the Court allowed only the Plaintiffs' claims for constructive trust against the so-called "Knowledge Defendants" to proceed. *Id.* at 301 ("The suggestion that the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the contract and requires restitution lacks support. The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust."). In December 2020, this Court ruled that § 546(e) bars Plaintiffs' BVI avoidance claims to recover unfair preferences and undervalue transactions. *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *1 (Dec. 14, 2020) ("*Fairfield III*").

Following these decisions, only the constructive trust claims survived. *Id.*; *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2021 WL 771677, at *1 (Bankr. S.D.N.Y. Feb. 23, 2021)

("*Fairfield IV*"), *aff'd*, 630 F. Supp. 3d 463 (2022).  The Liquidators filed a further motion to

amend the complaints against the Knowledge Defendants.  Mot. to Amend, ECF No. 133; Mot.

to Amend, Adv. Pro. No. 10-03496, ECF No. 3737.  On August 5, 2021, this Court granted the

motion to amend the complaint and lifted the stay of the redeemer actions.  Order Granting Mot.

to Amend, ECF No. 142; Order Lifting Stay of Redeemer Actions, ECF No. 141.

### C.  <u>The Pending Motion</u>

The Amended Complaint seeks the imposition of a constructive trust on the redemption

payments received from the Fairfield Funds.  Am. Compl. ¶ 179, ECF No. 143.  The Amended

Complaint alleges that BNP Paribas SS had knowledge of the fraud at BLMIS and therefore

knowledge that the NAV was inflated.  *Id.* ¶ 183–88.  "By reason of their receipt of some or all

of the Redemption Payments, Defendants[8] have been unjustly enriched to the detriment of Sentry

and Sigma and other shareholders and creditors of Sentry and Sigma."  *Id.* ¶ 190.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts

recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully

blinds himself to that fact."  *Id.* ¶ 180 (citing 596 B.R. at 293).  As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the
> BVI, 'the plaintiff must show, first, a disposal of his assets in breach of fiduciary
> duty; second, the beneficial receipt by the defendant of assets which are traceable
> as representing the assets of the plaintiff; and third, knowledge on the part of the
> defendant that the assets he received are traceable to a breach of fiduciary duty.'

*In re Fairfield Sentry Ltd.*, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) (quoting *El Ajou*

*v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

The Amended Complaint alleges that the defendants, including Altipro as a beneficial

shareholder of BNP accounts, purposefully availed themselves of the laws of the United States

---

[8]      As stated *supra* page 2, footnote 2, the Amended Complaint alleges that several other defendants may have
received redemption payments made to BNP Paribas SSL.  *Id.* ¶¶ 35–44.

and the State of New York by "investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS and maintaining bank accounts in the United States at BNP Paribas, and in fact receiving Redemption Payments in those United States-based and/or New York-based accounts." Am. Compl. ¶ 20, ECF No. 143.

The parties engaged in personal jurisdiction discovery between September 2021 and August 2022. *See* Second Am. Scheduling Order, ECF No. 223; *Id.* Fact discovery is ongoing in this case. *See* Eighth Am. Scheduling Order, ECF No. 305.

Defendant has moved to dismiss the Amended Complaint for lack of personal jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts with the forum to establish personal jurisdiction over Defendant and that exercising personal jurisdiction would be unreasonable. *See* Mem. L. at 3–5, ECF No. 172.

The Liquidators filed an opposition to the Motion and submitted the declarations of David Molton and Sara Joyce in support of their opposition. Opp'n, ECF No. 277; Molton Decl., ECF No. 278; Declaration of Sara Joyce ("Joyce Decl."), ECF No. 279.[9] The Liquidators argue that exercising jurisdiction over Defendant would be reasonable and that Defendant's contacts with the United States in knowingly and intentionally investing in the Fairfield Funds, using U.S. correspondent accounts to invest in and receive payments from Sentry, and conducting other business activities support personal jurisdiction. Opp'n at 2–4, ECF No. 277. Defendant filed a reply memorandum on October 10, 2023. Reply, ECF No. 291. This Court

---

[9]    Pursuant to various orders of this Court, portions of certain filings and supporting documents were filed under seal. At the Hearing on the motion, the Court gave the parties the opportunity to withdraw from the record any previously-sealed materials that the party did not want to be cited, quoted, or otherwise referenced in the opinion. Hr'g Tr. 12:5–17, ECF No. 315. None of the parties in this matter requested information withdrawn. The Court will nevertheless refrain from referring to any bank account numbers or names of individual employees, named only in sealed documents, in full.

reviewed the above filings and held a hearing on the Motion on May 3, 2024. *See* Hr'g Tr., ECF No. 315.

## IV.    DISCUSSION

### A. The Law of Personal Jurisdiction

In order to subject a defendant to personal jurisdiction in the United States, due process requires that the defendant have sufficient minimum contacts with the forum in which the defendant is sued "'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "In adversary proceedings, courts must determine whether the defendant has minimum contacts with the United States, rather than with the forum state." *Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021) (citing *In re Lehman Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)). "When jurisdiction is satisfied through Bankruptcy Rule 7004,[10] a bankruptcy court need not address its state's long-arm statute." *Id.* n.12; *see also Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 630 (4th Cir. 1997).

An analysis of minimum contacts "focuses on the relationship among the defendant, the forum, and the litigation," a relationship that "must arise out of contacts that the defendant himself creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations

---

[10]    "The summons and complaint and all other process except a subpoena may be served anywhere in the United States." Fed. R. Bankr. P. 7004(d). A bankruptcy court may exercise personal jurisdiction over a defendant served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States." Fed. R. Bankr. P. 7004(f).

omitted). There are three conditions necessary for the Court to exercise specific jurisdiction[11]

over the non-resident defendant:

> First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State. Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct. Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation

marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule

of Civil Procedure Rule 12(b)(2), the Plaintiff "must make a prima facie showing that

jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting

*Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)). A trial court has

considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2).

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies

depending on the procedural posture of the litigation." *Id.* (quoting *Ball v. Metallurgie Hoboken-

Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Following discovery, "the plaintiff's prima

facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of

facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant."

*Ball*, 902 F.2d at 197. "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the

---

[11]    Courts recognize "two types of personal jurisdiction: general and specific jurisdiction. A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. -----, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)). The Plaintiffs do not allege that the Court has general jurisdiction over Defendant. *See* Mem. L. at 10, ECF No. 177 ("Plaintiffs do not allege that the Court has general jurisdiction over this French Defendant, which is not "at home" in the United States, and so Plaintiffs must plead facts supporting the exercise of specific jurisdiction over Defendant."); Opp'n at 2 (arguing that the Court's specific jurisdiction is founded on Defendant's contacts with the forum that relate to the claims at issue).

plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction.'" *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL 5016884, at *4 (S.D.N.Y. June 30, 2023) (quoting *Dorchester Fin. Sec.*, 722 F.3d at 85). "Now that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy." *Averbach*, 2023 WL 5016884, at *6 (citing 722 F.3d at 85). "Plaintiffs need only show that their prima facie showing of jurisdiction is factually supported." *Id.* at *6. When considering a motion to dismiss before or after jurisdictional discovery has taken place, "the court must 'construe the pleadings and affidavits in the light most favorable to plaintiffs,' and resolve all doubts, including factual disputes, in the plaintiff's favor." *Id.* at *4 (quoting *Ball*, 902 F.2d at 197).

## B. <u>Analysis of Purposeful Availment</u>

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013)). For specific personal jurisdiction, "'[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit,' and the plaintiff's claim must in some way 'arise from the defendant's purposeful contacts with the forum.'" *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)). "Although a defendant's contacts with the forum state may be 'intertwined with [its] transactions or interactions with the plaintiff or other parties . . . [,] a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction.'" *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*,

571 U.S. at 134) (alteration in original).  "It is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction."  *Id.*

Defendant asserts that "Plaintiffs have elsewhere, when it has served their purposes, acknowledged the foreign nature of these lawsuits."  Mem. L. at 2, ECF No. 172.  Defendant points to the Plaintiffs' arguments before the District Court, wherein Plaintiffs argued that "every relevant component of the transactions at issue here occurred outside the territorial jurisdiction of the United States."  *Id.*; *see also* Pls.-Appellants' Opening Br. for Second Round Appeal at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (S.D.N.Y. July 21, 2021), ECF No. 440 (the "Opening Brief").  The Plaintiffs' Opening Brief concerned the extraterritorial application of the § 546(e)[12] safe harbor.  *See* Opening Brief at 24 (arguing that the "Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply extraterritorially to shield from avoidance settled securities transactions that occurred exclusively outside the United States.").

As another bankruptcy court in this district has stated, the "tests for personal jurisdiction and extraterritoriality are not the same."  *Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Israel Corp.)*, 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017).  In *Spizz*, the bankruptcy court was able to simultaneously find that the "[t]ransfer was not domestic, and hence, cannot be avoided" under § 547, while also clarifying that by "attend[ing] meetings in New York around

---

[12]     Section 546(e) of the Bankruptcy Code prohibits a trustee from avoiding a transfer that is a margin payment or settlement payment "made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract. . . ."  11 U.S.C. § 546(e).  "By its terms, the safe harbor is a defense to the avoidance of the *initial* transfer."  *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original).

the time of, and apparently in conjunction with, the commencement of the chapter 11 case," a

defendant may be "subject to specific personal jurisdiction." *Id.* at 613–14.

By arguing in the District Court that the redemption transfers were foreign for purposes

of extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum

for purposes of personal jurisdiction. To determine whether a transaction is foreign or domestic

for analyzing extraterritoriality issues for federal statutes, courts look at whether the "conduct

relevant to the statute's focus occurred in the United States." *RJR Nabisco, Inc. v. European

Cmty.*, 579 U.S. 325, 326, 136 S. Ct. 2090, 2094, 195 L. Ed. 2d 476 (2016). To determine

whether personal jurisdiction is appropriate, however, courts analyze a defendant's contacts with

the forum "under a totality of the circumstances test." *Licci*, 732 F.3d at 170 (citing *Best Van

Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).

### 1. <u>Defendant's Use of Correspondent Accounts</u>

The Plaintiffs point to the Defendant's agent's choice to use correspondent accounts as

sufficient to establish minimum contacts with the United States. Opp'n at 25–27, ECF No. 260.

"Correspondent accounts are accounts in domestic banks held in the name of foreign financial

institutions" that are used "to effect dollar transactions." *Licci ex rel. Licci v. Lebanese

Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (quoting *Sigmoil Res., N.V. v. Pan

Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dept 1996)).

Plaintiffs allege that Defendant, through its agent, deliberately selected and used these U.S.

correspondent accounts multiple times to effectuate the subscription and redemption payments

that form the harms for which Plaintiffs seek redress. Opp'n at 26, ECF No. 277.

Defendant argues that the "mere use of a correspondent account by a foreign bank to

clear transfers for a foreign contract denominated in U.S. dollars does not, as a matter of law,

confer jurisdiction over the foreign bank." Mem. L. at 15, ECF No. 172 (citing *Hau Yin To v. HSBC Holdings PLC*, No. 15CV3590-LTS-SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66 (2d Cir. 2017)).

The cases that Defendant relies upon are distinguishable from the circumstances here. *Hau Yin To* found no basis for personal jurisdiction over a foreign defendant where the "wiring of funds through New York . . . was passive, rather than 'integral' to the alleged Ponzi scheme" and where the "passage of money through the U.S. bank accounts w[as] merely incidental and not specifically directed by any of the [defendants] to facilitate the Ponzi scheme." *To*, 2017 WL 816136, at *7 n.6. These facts were contrasted with those presented in *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, N.E.3d 1 (2016), where the New York Court of Appeals "held that the foreign bank was subject to personal jurisdiction in New York because the 'defendants [including the foreign bank] orchestrated the money laundering and that the New York account was integral to the scheme.'" *Id.* (citing *Rushaid*, 28 N.Y.3d at 328) (alterations in original); *see also Vasquez v. H.K. & Shanghai Banking Corp. Ltd.*, 477 F. Supp. 3d 241, 253 (S.D.N.Y. 2020) (distinguishing between the "'unintended and unapproved use of a correspondent bank account, where the nondomiciliary bank is a passive and unilateral recipient' of money transfers, and the '[r]epeated, deliberate use that is approved by the foreign bank on behalf and for the benefit of a customer[.]'") (alteration in original) (quoting *Rushaid*, 28 N.Y.3d at 326–27). Furthermore, in *Rushaid*, "there was a scheme in which the foreign bank specifically contemplated wiring tainted funds into a New York account from which corrupt payments were then further distributed to individuals with accounts at the foreign bank." *To*, 2017 WL 816136, at *7 n.6.

Similarly, any reliance on *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720 (S.D.N.Y. 2010) is misplaced. *See* Mem. L. at 4, ECF No. 172. In *Tamam*, the District Court made clear

that the complaint failed to provide "allegations that any money from any of these accounts was exchanged for U.S. dollars through a correspondent bank in New York." *Id.* at 727. The District Court noted that the missing proposition, "i.e., the actual transfer of money through New York" was the "only factual predicate on which th[e] Court could potentially base its jurisdiction." *Id.*; *see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 58 (2d Cir. 2012) (discussing the failure of plaintiffs in a case "factually similar" to *Tamam* to allege that the conduct giving rise to the cause of action was directly financed by funds transferred through New York).

Finally, with regard to *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 339–40 (S.D.N.Y. 2016), the Court notes that the import of this case was already discussed by the District Court in *Great W. Ins. Co. v. Graham*, No. 18-CV-6249 (VSB), 2020 WL 3415026 (S.D.N.Y. June 22, 2020). The District Court explained in *Graham* that under *Hill*, a court evaluating whether a defendant purposefully availed itself of conducting activities in the forum must "look[] at the totality of the circumstances." *Id.* at *11. "While [one] fact alone might not necessarily be sufficient, . . . upon consideration of the 'totality of the circumstances,'" the Court may nevertheless find that the Defendant purposefully availed itself of New York. *Id.* at *16 (quoting *Hill*, 207 F. Supp. 3d at 338).

Here, the Plaintiffs have shown that the Defendant was able to use a foreign-based or a U.S.-based correspondent bank account for its redemption requests and, through its alleged agent, chose the latter. *See* Molton Decl. Ex.15 (showing redemption records); *see* Joyce Decl. at 6–9, ECF No. 262.; *id.* at 11 ("[S]ubscription agreements for Fairfield Sentry . . . do not contain any requirement that the subscriber utilize a U.S. account to send subscription payments or receive redemption payments."); *id.* at 12 ("Neither the fact that Fairfield Sentry was a U.S.-

dollar denominated fund, nor the fact that the subscription agreement instructed subscribers to wire their subscription payments to Sentry's U.S. account, nor the fact that Sentry made redemption payments from its own U.S. account would have prevented a subscriber from making subscription payments from and directing redemption payments to a U.S. dollar account located outside the U.S."); *id.* at 12–13 ("The U.S. dollar was in wide circulation outside the U.S. during the Relevant Period, and many other payment options were widely available and easily accessible during the Relevant Period. To the extent that a foreign subscriber chose a U.S.-based correspondent account to effectuate their payments, it was generally for reasons of its own convenience or financial benefit.").

This was no passive endeavor; the Plaintiffs allege that Defendant "via its agent BNP SS, used U.S. correspondent accounts in transacting with Sentry." Opp'n at 27, ECF No. 277. Defendant did so repeatedly, using U.S.-based correspondent accounts to make three subscription payments between March 2005 and July 2007 for over 19,507 shares of Sentry. Opp'n at 7, 25; Molton Decl. Exs. 2–4, 6. Defendant, through its agent, selected and used its correspondent account to receive a redemption payment from Sentry totaling over $15 million. Opp'n at 3, 26; Molton Decl. Ex. 15 at -7643. Altipro accomplished the conduct at the heart of the Liquidators' claims through its use of the correspondent accounts. The Second Circuit has found the selection and repeated use of in-forum correspondent accounts to perpetrate the alleged violations supports a finding of sufficient minimum contacts. *Licci ex rel Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013).

Defendant next argues that "[t]here is no allegation that Altipro was involved in the selection of this correspondent account [for subscription payments] by the Funds' agent." Mem. L. at 18, ECF No. 172. Altipro argues that the knowing use of correspondent accounts is the

"unilateral activity of another party" and thus not an appropriate consideration when determining whether defendant has sufficient contacts with the forum. *Id.* (quoting *Helicopteros*, 466 U.S. at 417). As stated above, however, the Liquidators have shown that Defendant actively selected its correspondent accounts as a means of moving funds through New York. *See* Joyce Decl. at 8, ECF No. 279 (listing multiple "correspondent banks offer[ing] U.S. dollar correspondent accounts located outside of the U.S." during the relevant period). Defendant was free to designate an account of its choice, inside the United States or outside, to effectuate transfers and chose one based in the U.S. to process subscription payments and receive redemption payments. *See id.* at 9–11 ("Factors Influencing Choice of Correspondent Account"); *id.* at 11 ("[T]he subscription agreements direct subscribers to wire the payments to the Fund's account at HSBC Bank, New York. The subscription agreements further direct the subscribers to identify the remitting bank for those redemption payments. The relevant clauses contain no requirement that the bank utilized for sending subscription payments be based in the U.S.").

The Second Circuit has determined that allegations of a "foreign bank's repeated use of a correspondent account in New York on behalf of a client . . . show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339, 984 N.E.2d 893, 900 (2012)); *see also Spetner*, 70 F.4th at 640 ("[A] defendant foreign bank's 'repeated use of a correspondent account in New York on behalf of a client . . . can constitute transacting business for purposes of § 302(a)(1),

even if the defendant has no other contacts with the forum."). [13]  A course of dealing can be

established through as little as "14 currency exchange transactions between" two foreign entities

made to a New York bank.  *Al Rushaid*, 28 N.Y.3d at 325.

The Liquidators have provided support for the allegation that Defendant chose to use a

U.S. correspondent account to receive payments from Sentry.  Opp'n at 26 ECF No. 277; Molton

Decl. Ex. 15 (showing a redemption request from Sentry to be sent to a bank in New York).  The

subscription and redemption forms show that Defendant designated the U.S.-based

correspondent bank, to which Sentry accordingly sent the relevant payment.  While the

Defendant in this proceeding is only alleged to have designated a correspondent account once,

this redemption was no small amount.  Altipro is alleged to have received over $15 million

through this transaction, demonstrating its purposeful availment of the banking system of New

York and the United States.  Whether discretionary or execution-only, Defendant chose to use

New York-based accounts while foreign options existed.

## 2.  <u>Defendant's Business Contacts with the Forum</u>

The Liquidators assert that Defendant "intentionally invested in BLMIS feeder fund

Sentry, knowing that Sentry was designed to subsequently invest that money in New York-based

BLMIS.  Altipro is subject to this Court's jurisdiction with respect to its Sentry redemption as a

result of that conduct."  Opp'n at 18, ECF No. 277.  Defendant describes the allegations that it

knew the subscription payments into the Fairfield Funds would be invested in BLMIS in New

York as the unilateral activity of a third-party administrator of the Funds, which Defendant

---

[13]      Section 302(a)(1), New York's long-arm statute, "authorizes personal jurisdiction over a foreign defendant
for causes of action that arise out of 'transact[ing] any business within the state,' whether in person or through an
agent."  70 F.4th at 640 (quoting C.P.L.R. § 302(a)(1)).

argues is not appropriate to consider under *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984).  *See* Mem. L. at 9–10, ECF No. 172.

In *Helicopteros*, the Supreme Court found that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Helicopteros*, 466 U.S. at 418.  The Supreme Court found that "one trip" to the forum "for the purpose of negotiating the transportation-services contract . . . cannot be described or regarded as a contact of a 'continuous and systematic' nature . . . ."  *Id.* at 416.  The Liquidators, however, have described more substantial contacts here.

First, the Liquidators point to the documents given to Altipro by the Funds' U.S.-based manager, Fairfield Greenwich Group ("FGG"), after Altipro requested such documents.  Opp'n at 5, ECF No. 277.  These documents "made clear that the main purpose of the Funds' existence was to invest in BLMIS" in New York.  *Id.* at 6; *see also* Molton Decl. Ex. 10, ECF No. 278 (2003 Sentry Private Placement Memorandum describing the business objective of Sentry as "seek[ing] to achieve capital appreciation of its assets through the purchase and sale of securities principally by utilizing an options trading strategy described as 'split strike conversion'"); *see also id.* Ex. 11 (2006 Sentry Private Placement Memorandum describing the same business objective and explaining that the "Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC . . . .").  Sentry would allocate no more than 5% in aggregate of its net asset value in investments other than BLMIS's split strike conversion strategy.  *Id.* Exs. 10–11.  The Sentry Private Placement Memoranda identified BLMIS as a sub-custodian of the Fund.  *Id.*  These documents show that Defendant was aware at the time that its investments in

Sentry was effectively an investment in BLMIS in New York. It instructed its agent, BNP SS, to execute subscriptions into Sentry with this knowledge.

In August 2018, this Court held that it does not have personal jurisdiction over certain defendants due to subscription agreements that provided for consent to jurisdiction in New York for claims "with respect to [the Subscription] Agreement and the Fund." *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *11 (Bankr. S.D.N.Y. Aug. 6, 2018). The Liquidators here rely on the subscription agreements and private placement memoranda not to show consent, but to show that when Defendant invested in Sentry, it did so knowing that it would avail itself of the benefits and protections of New York. Opp'n at 21–23. The subscription agreements, signed by BNP SS as an agent of Altipro, in this way, support the Plaintiffs' showing of contacts with the forum.

The Plaintiffs have supplied further evidence to support the allegations of contacts. Exhibits show Altipro "communicating repeatedly both in meetings and by email with FGG New York personnel." Opp'n at 21; Molton Decl. Ex. 7 (February 2004 email exchange wherein FGG personnel in New York provides Defendant with a Sentry semi-annual update following a request by employee of Defendant asking for "something more specific on Fairfield Sentry such as an explanation of the trades during the month . . . ."); *id.* Ex. 8 (May 2006 email exchange wherein New York-based FGG vice president responds to a request of employee of Defendant with a monthly review of Sentry, a "2006 Fact Sheet," and information concerning the amount of assets under Sentry's management); *id.* Ex. 9 (July 2003 email exchange between Defendant and FGG members with "fggus.com" email address and subsequent internal FGG email exchange describing Defendant personnel visiting FGG in New York to "discuss Sentry and FGG risk management in general"); *id.* Ex. 13 (September 2003 email from Defendant to FGG member asking for a "report on a monthly basis from now on"). These documents demonstrate more than

mere purchases or a one-time visit to the forum.  The Liquidators have demonstrated facts

supporting continuous and systemic contacts with the forum.

**3.  Whether the Defendant's Contacts are Otherwise Appropriate to Support the Court's Exercise of Personal Jurisdiction**

The Court will address Altipro's remaining arguments that the alleged contacts are not

jurisdictionally relevant under Supreme Court precedent.  Mem. L. at 11–14, ECF No. 172.

Defendant argues that the Plaintiffs' allegations amount to "mere knowledge that Sentry would

invest money it raised in the BVI with BLMIS in New York," which it states is "insufficient as a

matter of law to support jurisdiction" under *Walden v. Fiore*, 571 U.S. 277 (2014).  *Id.* at 11.

In *Walden*, the Supreme Court found that a defendant "formed no jurisdictionally

relevant contacts" with the forum state of Nevada as "[p]etitioner never traveled to, conducted

activities within, contacted anyone in, or sent anything or anyone to Nevada."  *Walden*, 571 U.S.

at 289.  The Supreme Court further stated that it is impermissible to allow the "plaintiff's

contacts with the defendant and forum to drive the jurisdictional analysis."  *Id.*  As the Supreme

Court explained, the "plaintiff cannot be the only link between the defendant and the forum," and

"the defendant's conduct . . . must form the necessary connection with the forum State."  *Id.* at

285.  Nevertheless, personal jurisdiction may be found even where a "defendant's contacts with

the forum State may be intertwined with his transactions or interactions with the plaintiff or other

parties."  *Id.* at 286.

The Plaintiffs' allegations and supporting evidence of intentional investment into BLMIS

in New York and interactions with the Fairfield Greenwich Group, as described above,

demonstrate that Altipro took affirmative actions on its own apart from the conduct of the

Plaintiffs.  *See, e.g.,* Opp'n at 23, ECF No. 277.  In addition to supporting allegations of

meetings between Altipro employees and FGG in New York, the Liquidators have shown that

the Defendant knew and intended that, by investing in the Funds, Defendant's money would

enter into U.S.-based BLMIS. *Id.*; *see also* Molton Decl. Exs. 10–11 (Sentry private placements

memoranda). This certainty can be found in the Fairfield Funds' contractual obligation to invest

at least 95% of the money they received in U.S.-based BLMIS. *See id.* Ex. 11 ("The Investment

Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never

to exceed, in the aggregate, 5% of the Fund's Net Asset Value, measured at the time of

investment) to alternative investment opportunities other than its 'split strike conversion'

investments . . . ."). Moreover, Defendant conducted due diligence investigations and benefited

from investigations from its predecessors that confirmed the investments would be made with

BLMIS in New York. *See id.* Exs. 7–9, 12–14 (described *supra*, section IV.B.2.).

  The Defendant argues that "Altipro's due diligence" including "meetings and

correspondence with the fund manager, FGG, and its 'New York personnel'" are incidental

contacts having nothing to do with the redemption payments. Reply at 14 (citing *Hau Yin To*,

700 F. App'x 66, 67 (2d Cir. 2017) and *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir.

2018)). In *To*, the Court of Appeals upheld the District Court's finding that certain

communications and "transmissions of funds to and from BLMIS located in New York" were

"incidental consequences of fulfilling a foreign contract" and thus insufficient for establishing

personal jurisdiction. 700 F. App'x at 67; *Hau Yin To v. HSBC Holdings PLC*, No. 15CV3590-

LTS-SN, 2017 WL 816136, at *6 (S.D.N.Y. Mar. 1, 2017). Similarly, in *SPV Osus*, the Court of

Appeals found that the alleged contacts were insufficient partly due to the lack of reliance on

those contacts in the decision to invest. 882 F.3d at 345 ("Nor are there any allegations that

OSUS based its decision to invest with BLMIS on the fact that the UBS defendants helped create

and service the feeder funds. Indeed, OSUS began investing in BLMIS in 1997, and the feeder

funds were not created until 2003 (Groupement) and 2004 (Luxalpha).").  The Plaintiffs here allege that the due diligence was performed as a prerequisite to investing in Sentry and, consequently, BLMIS in New York.  This was not incidental to a contract.  It was the necessary grounds upon which defendant made its decision to invest in Sentry.

Defendant next argues that the Liquidators' evidence of Defendant's contacts with the United States amounts to little more than the stream of commerce theory rejected by *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882–86 (2011), where the Court stated that "it is not enough that [a] defendant might have predicted that its goods will reach the forum," but rather the defendant must "engage[] in conduct purposefully directed at [the forum]."  Mem. L. at 12, ECF No. 172.  The Liquidators argue that the Defendant did not merely expect that the investments would reach the United States, but rather that Defendant's express purpose of investing in the Fairfield Funds was to invest with BLMIS in New York.  Opp'n at 23, ECF No. 277 ("Altipro directed BNP SS to invest in Madoff feeder funds with the *express aim* of having those investments placed with a U.S.-based investment fund to take advantage of the U.S. securities markets and while knowing that Sentry was *contractually required* to invest at least 95% of the money they received in U.S.-based BLMIS.") (emphasis in original); *id.* at 24 ("The sole purpose for subscribing for shares of Sentry was to ultimately redeem those shares . . . ."); *id.* at 32 ("Altipro . . . through its agent BNP SS, deliberately chose to invest in and profit from the U.S. securities market . . . .").  This conduct was purposefully directed at the forum.

The Court thus finds that Defendant's selection and use of U.S. correspondent accounts, meetings with FGG, and communications concerning investments with BLMIS in New York support the Court's exercise of jurisdiction over the claims for receiving redemption payments from the Fairfield Funds with the knowledge that the NAV was wrong.  The contacts are not

24

random, isolated, or fortuitous.  The contacts demonstrate Altipro's purposeful activities aimed at New York in order to effectuate transfers from Sentry.  The Plaintiffs have thus provided facts that sufficiently support a prima facie showing of jurisdiction over the Defendant.

**4.** **Whether the Contacts of BNP Should be Attributed to Defendant as Actions of an Agent**

Altipro argues that many of the alleged contacts were made or done by BNP SS, which was not acting as an agent for Altipro. Reply at 1, ECF No. 291; *see also* Hr'g Tr. 116:15–21, ECF No. 315 ("Altipro has never had or used any U.S. correspondent account and didn't direct anyone else to do so. Plaintiffs do allege that BNP and Sentry used U.S. correspondent accounts in redeeming Altipro's subscriptions, but Altipro did not direct BNP to do that or have any control over BNP's use of U.S. correspondent accounts."). While Altipro concedes that it "directed BNP SS to . . . execute the foreign subscription investments with Sentry and subsequent redemption payments" it argues that this "does not create the sweeping agency relationship that the Liquidators claim." Reply at 1.

The Plaintiffs allege that Altipro retained BNP SS as an agent in order to subscribe into and receive redemption payments from Sentry. Opp'n at 2, ECF No. 277; *see also* Hr'g Tr. 123:13–16, ECF No. 315 ("The Defendant . . . went out and they hire[d] - - and there's no other word that describes it - - they hired an agent to make this investment for them. The agent as part of the requirements to make that investment, yes, signed subscription agreements, used . . . their U.S. correspondent bank accounts . . . ."). BNP SS "facilitated investors' subscriptions in Sentry by serving as a shareholder of record for Sentry's beneficial shareholders, such as Altipro." *Id*. The Liquidators allege that BNP SS "deliberately and repeatedly utilized U.S. bank accounts to process Altipro's subscription and redemption payments as knowingly authorized by Altipro." *Id.* Furthermore, the Plaintiffs allege that Altipro "took these actions after it conducted due diligence on Sentry and after it received materials informing it that its investments would be placed with BLMIS for the purpose of trading the U.S. securities market." *Id.*

The Plaintiffs argue that "a defendant 'can purposefully avail itself of a forum by directing its agents … to take action there.'" Opp'n at 13–14 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014)). In the absence of a formal agency relationship, the Court may impute an agent's conduct within or aimed at the forum to the principal based on "the realities of the relationship in question rather than the formalities of agency law." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986). The Court may exercise jurisdiction over a principal where "the agent acted in [the forum] for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *In re Eur. Gov't Bonds Antitrust Litig.*, 2020 WL 4273811, at *6 (S.D.N.Y. Jul. 23, 2020). Altipro disputes each of these elements and characterizes BNP SS's role as being limited to "execute the foreign subscription investments with Sentry and subsequent redemption payments. Reply at 1, 4, ECF No. 291.

### a.  <u>On Behalf of and for the Benefit of the Principal</u>

Plaintiffs argue that BNP SS's actions were on behalf of and for the benefit of Altipro as BNP SS's actions "open[ed] the principal to financial gain." Opp'n at 15, ECF No. 277 (citing *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d at 336 (finding defendants benefited from agent's trading activities which could result in gain if financially successful); *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 319 (S.D.N.Y. 2009) (finding benefit where defendant "stood to benefit" from the alleged agent's "actions and contracts by receiving some or all of the sale price")).

Plaintiffs state that it is undisputed that BNP SS "subscribed to shares of Sentry pursuant to Altipro's order of the shares and that Altipro was the beneficial owner of those shares." Opp'n at 16. The subscriptions were done allegedly "as a means of profit" by indirectly

investing in BLMIS. *Id.* Altipro argues that the evidence, in the form of Sentry's private

placement memoranda, shows that "BNP SS subscribed to shares *of Sentry*, not BLMIS, and it

did not direct Sentry to invest in BLMIS, so this is not 'acting in the forum' in the first place."

Reply at 4. The Court has already rejected this argument as applied to the appropriateness of the

alleged contacts. (*See supra*, section IV.B.3). First, the express purpose of investing in the

Fairfield Funds was to invest with BLMIS in New York. Opp'n at 23, ECF No. 277 ("Altipro

directed BNP SS to invest in Madoff feeder funds with the *express aim* of having those

investments placed with a U.S.-based investment fund to take advantage of the U.S. securities

markets and while knowing that Sentry was *contractually required* to invest at least 95% of the

money they received in U.S.-based BLMIS.") (emphasis in original); *id.* at 24 ("The sole purpose

for subscribing for shares of Sentry was to ultimately redeem those shares . . . ."); *id.* at 32

("Altipro . . ., through its agent BNP SS, deliberately chose to invest in and profit from the U.S.

securities market . . . ."). Furthermore, the Liquidators supplied evidence of repeated

communications with FGG in New York and at least one meeting. Molton Decl. Exs. 7–9, 13.

The Liquidators have demonstrated facts supporting continuous and systemic contacts with the

forum. The Liquidators' evidence sufficiently alleges actions on behalf of Altipro in the forum.

### b.  At the Direction and Under the Control of the Principal

In order to assert an agency relationship, the principal must have exercised "some

control" over the purported agent. *Scholastic, Inc. v. Stouffer*, 2000 WL 1154252, at *5

(S.D.N.Y. Aug. 14, 2000). The amount of control required "need not rise to the level of absolute

control over the acts or decisions of the putative agent; rather, it may involve the ability of the

principal to influence such acts or decisions by virtue of the parties' respective roles." *Id.* (citing

*Cutco Indus. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)). The Plaintiffs argue that the

control prong is satisfied when the principal has "[an] ability . . . to influence [the agent's] acts or decisions by virtue of the parties' respective roles." Opp'n at 15, ECF No. 277 (alterations in original) (quoting *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 442 (S.D.N.Y. 2008)).

The Plaintiffs argue that this factor is satisfied because "BNP SS could subscribe to and redeem shares in Sentry on behalf of Altipro if and only if Altipro instructed BNP SS to execute such transactions." Opp'n at 16, ECF No. 277. "Therefore, Altipro was the principal with respect to those transactions and exercised the requisite control over BNP SS as its agent." *Id.* In support, the Plaintiffs provide evidence of BNP SS subscribing to shares of Sentry on behalf of Altipro and redeeming those shares on Altipro's behalf. *See* Molton Decl. Exs. 2–5, 15, ECF No. 278.

Altipro argues that "[a]gain, 'those transactions' are foreign" and thus insufficient to establish agency. Reply at 5 (citing *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 335–37 (S.D.N.Y. 2000) ("Plaintiffs' allegations must . . . persuade a court that the defendant was a 'primary actor' in *the specific matter in question*") (citations omitted and emphasis added by Defendant)).

Defendant does not explain how the supposed foreignness of the transactions are relevant to the analysis of whether Altipro's exercised any control over BNP SS. The Court has already discussed the supposed foreignness of the transactions as it relates to the first element of agency.

### c.  <u>Pursuant to the Principal's Knowledge and Consent</u>

Knowledge and consent of the principal has been found where an agent forwarded information to the principal (*Sec. Ins. Co. of Hartford v. ITA Textiles Corp.*, 2000 WL 1576879, at *2–4 (S.D.N.Y. Oct. 23, 2000)), where the complaint asserts that the principal received a policy procured by its agent with a "New York forum selection clause that [the principal] knew

or should have known was included" (*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 2021 WL 2000371, at *9 (S.D.N.Y. May 19, 2021)), and where the principal is alleged to have done nothing after having received a cease-and-desist letter aside from forwarding the letter to counsel. *Branham v. ISI Alarms, Inc.*, 2013 WL 4710588, at *7 (E.D.N.Y. Aug. 30, 2013).

The Plaintiffs argue that the knowledge and consent prong is satisfied as BNP SS allegedly requested that the "investmentmgt@altigefi.com email address be copied, in addition to BNP SS, on '[a]ll information related to' the relevant holdings, . . . and because Altipro communicated directly with [the Fairfield Greenwich Group] on numerous occasions, . . . and was directly advised, for example, that Sentry investments would have to be sent to Sentry's U.S. correspondent account." Opp'n at 17, ECF No. 277 (citing Molton Decl. Exs. 7–9, 12–14, 16–19, 20, 22).

Altipro argues that these are not the actions of the purported agent, BNP SS. Reply at 5. Altipro characterizes the subject of this evidence as the "alleged foreign investment and redemption transactions." *Id*. Altipro states that it "was obviously aware of and consented to those transactions," but that they are "irrelevant because they were not actions taken by BNP SS in the forum for Altipro's benefit." Reply at 6. However, as established by the cases cited by Plaintiffs, the Court may find knowledge and consent of the principal through the principal's receipt of relevant materials from the purported agent. *Sec. Ins. Co. of Hartford*, 2000 WL 1576879, at *2–4; *Pilkington*, 2021 WL 2000371, at *9. The Court finds that the Plaintiffs have satisfactorily alleged the elements of agency required to impute the contacts of BNP SS to Altipro.

**C.  Whether the Claim Arises Out of or Relates to the Defendant's Forum Conduct**

The suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. ----, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (emphasis in original). "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required. *Id.* at 1027. Instead, a court need only find "an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Defendant argues that the claims "here are not about, and do not arise out of, any investment with BLMIS." Mem. L. at 4, ECF No. 17. However, the Liquidators seek imposition of a constructive trust on funds received with knowledge that the NAV was inflated. Am. Compl. ¶¶ 179–83, No. 143. The issue of knowledge of the inflated NAV is inextricably tied to the Defendant's investments with New York-based BLMIS. The allegations are directly related to Defendant's investment activities with BLMIS through the Fairfield Funds. The Defendant's contacts with the United States, in investing in and in communications with the Fairfield Funds, form a "sufficiently close link" between the defendant, the forum and the litigation concerning Defendant's activities in the forum. *See MSP Recovery Claims, Series LLC v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773, at *3 (S.D.N.Y. Sept. 29, 2021) (quoting *Ford Motor Co.*, 141 S. Ct. at 1032).

D. **Whether Assertion of Personal Jurisdiction is Reasonable**

If a defendant has sufficient minimum contacts, the Court must then ask "whether the
assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial
justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank
Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting
*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger
King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Where the plaintiff "makes the threshold
showing of the minimum contacts required for [exercising personal jurisdiction], a defendant
must present a compelling case that the presence of some other considerations would render
jurisdiction unreasonable." *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3
(quoting *Bank Brussels Lambert*, 305 F.3d at 129). Factors the Court will consider include the
burden on the defendant, the interests of the forum in adjudicating the case; the plaintiff's
interest in obtaining convenient and effective relief, the interstate judicial system's interest in
obtaining the most efficient resolution of controversies, and the shared interest of the states in
furthering fundamental substantive social policies. 305 F.3d at 129.

The Defendant argues that "the United States' interest in adjudicating this dispute is
minimal at best. The dispute is exclusively between foreign parties arising solely under foreign
law pursuant to a foreign contract governing a purely foreign transaction." Mem. L. at 20, ECF
No. 172. Defendant further argues that the proceeding is non-core, ancillary, and only tenable
due to Chapter 15 recognition. *Id.* (citing *In re Fairfield Sentry Ltd.*, 458 B.R. 665, 682
(S.D.N.Y. 2011) (Preska, J.)).

Defendant's reliance on *In re Fairfield Sentry Ltd.*, 458 B.R. 665, is misplaced. In that
case, the District Court determined whether the proceeding was core or non-core; it did not

determine whether adjudication or jurisdiction in the United States was reasonable. *See id.* at 675. Further, the Court has already found that it has subject matter jurisdiction over these proceedings. *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *8 (Bankr. S.D.N.Y. Aug. 6, 2018). Chapter 15 allows for recognition of Sentry's foreign main proceeding. 11 U.S.C. § 1501(a) ("The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency . . . ."); *id.* § 1504 ("A case under this chapter is commenced by the filing of a petition for recognition of a foreign proceeding under section 1515."). Defendant correctly states that cases brought under Chapter 15 are ancillary to foreign proceedings. *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *2. The ancillary character of such cases does not necessarily mean that the United States has minimal interest in the dispute.

Defendant argues it is burdened by the potential exposure to civil and criminal liability. Mem. L. at 21. In support of this argument, Defendant cites to a ruling in which the Court granted in part and denied in part a motion seeking relief as to the order staying the action and seeking expedited initial disclosures on beneficial holders. *Id.*; *see* Bench Ruling, Adv. Pro. No. 10-03496, ECF No. 799 (the "July 2012 Bench Ruling"). This Court based that ruling on a comity analysis in light of the then-uncertain "offshore underpinnings for this litigation in its entirety." *Id.* at 2. The Court stated in that ruling that it was "hard-pressed to find any compelling United States' interest in mandating discovery here *at this juncture* of the pending litigation." *Id.* (emphasis added).

Defendant has not shown that the interests at stake in that proceeding over ten years ago, are the same as those at stake now. Although defendants were previously able to identify specific laws in foreign countries that would have been broken by complying with the Court's

prior order, Altipro now only describes a potential exposure to liability. *See* Mem. L. at 21. This Court lifted the stay and required the Defendant to proceed to discovery in 2021. Order Lifting Stay, ECF No. 141; Scheduling Order, ECF No. 155. The July 2012 Bench Ruling shows that this Court can alleviate specific burdens identified by a defendant. The mere potential for exposure to unspecified liability is not a burden that renders exercise of jurisdiction unreasonable.

Defendant argues that "Plaintiffs have not demonstrated that it is more reasonable for them to litigate their claims against Altipro in New York rather than in the BVI . . . or in France . . . ." Mem. L. at 21. Defendant suggests that the Liquidators may be engaged in forum-shopping through "strategic maneuvering" and states that there is a burden placed on litigating in the forum as the "witnesses and evidence in this action are all overseas . . . ." *Id.* at 5.

The Defendant has demonstrated that this Court's exercise of jurisdiction over it may impose a minimal burden in terms of requiring it to "traverse the distance" to the forum. However, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010); *see also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023).

Altipro has participated in this litigation for three years and is represented by U.S. counsel. *See, e.g.,* Counter Designation, ECF No. 129. Furthermore, the United States has a strong interest in ensuring the integrity of its financial systems.

Defendant has alleged that other forums may be able to hear the claims.  What it has not

done is demonstrate how this forum would fail to provide effective relief.  *See MSP Recovery*

*Claims, Series LLC*, 2021 WL 4461773, at *3.  Defendant does not explain what interest is

impaired by precluding adjudication in another forum or why that interest outweighs other

factors in favor of exercising jurisdiction.  *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 22

CIV. 6561 (LGS), 2023 WL 395225, at *6 (S.D.N.Y. Jan. 25, 2023).  The Defendant has not

established that the Court's exercise of personal jurisdiction over it would be unreasonable.  The

Court thus finds that exercising jurisdiction over the Defendant is reasonable and comports with

"traditional notions of fair play and substantial justice . . . ."  *See Int'l Shoe*, 326 U.S. at 316, 66

S.Ct. 154.

## V.  **CONCLUSION**

For the foregoing reasons, the Court DENIES the Defendant's Motion to Dismiss the

Amended Complaint.  The Liquidators shall submit a proposed order consistent with the findings

in this decision in accordance with Local Bankruptcy Rule 9074-1(a).

**IT IS SO ORDERED.**


Dated: New York, New York
      June 14, 2024

                    /S/ John P. Mastando III_____
                    THE HONORABLE JOHN P. MASTANDO III
                    UNITED STATES BANKRUPTCY JUDGE