UNITED STATES BANKRUPTCY COURT                    *FOR PUBLICATION*

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>Fairfield Sentry Limited, et al.<br><br>                Debtors in Foreign Proceedings. | Chapter 15<br><br>Case No. 10-13164 (JPM)<br><br>(Jointly Administered) |
| FAIRFIELD SENTRY LTD. (In Liquidation), et al.,<br><br>                Plaintiffs,<br><br>v.<br><br>BNP PARIBAS SECURITIES SERVICES LUXEMBOURG, et al.,<br><br>                Defendants. | Adv. Pro. No. 10-03627 (JPM) |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS

*APPEARANCES:*

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
*Attorneys for the Defendant, BNP Paribas Securities Services Luxembourg*
One Liberty Plaza
New York, New York 10006
By:    Roger A. Cooper
        Ari D. MacKinnon
        Thomas S. Kessler

**BROWN RUDNICK LLP**
*Attorneys for the Plaintiffs Joint Liquidators*
Seven Times Square
New York, NY 10036
By:    David J. Molton
        Jeffrey L. Jonas
        Marek P. Krzyzowski

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

Pending before the Court is the motion of the Defendant, BNP Paribas Securities Services Luxembourg ("BNP" or "Defendant"), to dismiss the Fifth Amended Complaint (the "Amended Complaint" or "Am. Compl.") for lack of personal jurisdiction.  Mot. to Dismiss, ECF[1] No. 168. The parties did not request oral argument on the Motions, and instead indicated that they were resting on the papers.  *See Letter re: Status of Remaining Oral Arguments*, ECF No. 306.  For the reasons set forth herein, the Court DENIES the Defendant's Motion to Dismiss.

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).  This Court previously concluded that it has subject matter jurisdiction over this and related actions.  *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Fairfield I*").  Personal jurisdiction is contested by the Defendant and will be discussed below.

## III.    BACKGROUND

This adversary proceeding was filed on September 20, 2010.  *See Amended Complaint Against All Defendants* (the "Complaint" or "Compl."), ECF No. 6.  Kenneth M. Krys and Greig Mitchell (the "Liquidators" or the "Plaintiffs"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation) ("Sentry") and Fairfield Sigma Limited (In Liquidation) ("Sigma" and, together with Sentry, the "Fairfield Funds" or the "Funds") filed the Amended Complaint on August 11, 2021.  Am. Compl., ECF No.

---

[1]    Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 10-03627-jpm unless otherwise noted.

143.  Via the Amended Complaint, the Liquidators seek the imposition of a constructive trust and recovery of $46,993,332.47 in redemption payments made to BNP by Sentry and Sigma.  *Id.* ¶¶ 8, 179–93.

## A. THE BLMIS PONZI SCHEME

This adversary proceeding arises out of the decades-long effort to recover assets of the Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme.[2]  Am. Compl. ¶ 1, ECF No. 143.  The Defendant, BNP, is a Luxembourg bank.  *Memorandum of Law in Support of BNP Paribas Securities Services Luxembourg's Motion to Dismiss for Lack of Personal Jurisdiction under Rule 12(b)(2)* (the "Memorandum of Law" or "Mem. L.") at 1, ECF No. 169.  It is incorporated in France.  *Reply Memorandum of Law in Further Support of BNP Paribas Securities Services Luxembourg's Motion to Dismiss for Lack of Personal Jurisdiction under Rule 12(b)(2)* (the "Reply") at 1, ECF No. 286.  Further, BNP is part of a family of corporate entities who share information and a common parent entity — BNP Paribas S.A., a multi-national financial services firm (collectively, the "BNP Companies").  Am. Compl. ¶ 59.  BNP allegedly invested, either for its own account or for the account of others, into several funds, including Sentry and Sigma, that channeled investments into BLMIS.  *Id.* ¶¶ 2, 5, 16.

Fairfield Sentry was a direct feeder fund.  It was established for the purpose of bringing investors into BLMIS, thereby allowing Madoff's scheme to continue.  *Id.* ¶¶ 5; 46–47; *see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools money from numerous investors and then places it into a 'master fund' on their behalf. A master fund—what Madoff Securities advertised its funds to be—pools investments from multiple feeder funds and

---

[2]      The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff.  Details of that scheme have been recounted by many courts.  *See, e.g.*, *In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818 F. App'x 48 (2d Cir. 2020).

then invests the money."). Fairfield Sigma, in contrast, was an indirect feeder fund, established to facilitate investment in BLMIS through Fairfield Sentry for foreign currency. Am. Compl. ¶¶ 46–47. The BNP Companies created and administered another BLMIS feeder fund, the Oreades Fund, but allegedly liquidated it in May 2004 "because of the high probability of fraud at BLMIS and its fear of [potential liabilities] to the Oreades Fund's investors." *Id.* ¶¶ 60, 87.

BLMIS used investments from feeder funds, such as the Fairfield Funds, to satisfy redemption requests from other investors in the scheme. *Id.* ¶¶ 5–7. Without new investors, BLMIS would have been unable to make payments to those who chose to withdraw their investments, and the scheme would have fallen apart. *Id.* ¶¶ 5–7, 13–15.

The Amended Complaint alleges that investors received payments on account of their shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV"). *Id.* ¶ 7. BNP was allegedly one such investor. *Id.* To calculate the NAV, administrators used statements provided by BLMIS that showed "securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry." *Id.* ¶ 49. In fact, no securities were ever bought or sold by BLMIS for Sentry, and none of the transactions on the statements ever occurred. *Id.* ¶ 50. The money sent to BLMIS by the Fairfield Funds for purchase of securities was instead used by Bernard Madoff to pay other investors or was "misappropriated by Madoff for other unauthorized uses." *Id*. The NAVs were miscalculated, and redemption payments were made in excess of the true value of the shares. *Id.* ¶ 53. The Fairfield Funds were either insolvent when the redemption payments were made or were made insolvent by those payments. *Id* ¶ 52.

Bernard Madoff was arrested for alleged violations of federal securities laws on December 11, 2008. *Id.* ¶ 168. The United States Attorney brought criminal charges against him, alleging that Madoff ran a Ponzi scheme. *Id*. On December 11, 2008, the Securities Exchange Commission

filed an action in the Southern District of New York to halt the continued offerings of securities. *Id.* ¶ 169. In March 2009, Madoff pleaded guilty to criminal charges against him and confessed to operating a Ponzi scheme and fabricating statements and trade confirmations. *Id.* ¶¶ 170–71. Madoff was sentenced to 150 years in federal prison. *Id.* ¶ 171.

The Amended Complaint alleges that BNP, "had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated" when the redemption payments were made. *Id.* ¶ 183. The Amended Complaint further asserts that between 1997 and 2008, BNP "ascertained multiple indicia of fraud" though its affiliates' operation of the Oreades Fund. *Id.* ¶ 185. Executives of several BNP Companies expressed concerns over the propriety of Madoff's accounting practices. *See Id.* ¶ 184-85. Despite their concerns, BNP Companies still lent money to BLMIS feeder funds and investors. *Id.* ¶ 186. The Amended Complaint further alleges that during diligence for at least three of those lending transactions, the BNP Companies learned their competitors declined to lend to BLMIS due to concerns about Madoff. *Id.*

## B. <ins>THE PRIOR LITIGATION AND PROCEDURAL HISTORY</ins>

The Fairfield Funds were put into liquidation in the BVI in 2009. Am. Compl. ¶¶ 26–28, ECF No. 143. The BVI court issued orders appointing the foreign representatives, Kenneth Krys and Greig Mitchell, as liquidators of the Fairfield Funds. *Id.* ¶ 28. Pursuant to the appointment order of the BVI court, the "Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates." *Id.* ¶ 177. The Liquidators commenced actions in the BVI against investors who had redeemed shares of the Fairfield Funds before the collapse of the scheme. Mem. L. at 6, ECF No. 169; *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475 (S.D.N.Y. 2022); *see also In re Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 284 (Bankr. S.D.N.Y. 2018) ("<ins>*Fairfield II*</ins>").

4

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings. *Am. Compl.* ¶ 29, ECF No. 143. This Court granted that recognition on July 22, 2010. *Id.* All cases filed by the Plaintiffs were administratively consolidated before this Court in November 2010. *See* Consolidation Order, Adv. Pro. No. 10-03496, ECF No. 25.

The Plaintiffs asserted multiple causes of action in those consolidated adversary proceedings including, *inter alia*, mistaken payment and constructive trust.[3] Compl. ¶¶ 61–84, ECF No. 6; *see also* 630 F. Supp. 3d at 479. In October 2011, this Court stayed the U.S. proceedings pending resolution of the BVI proceedings. *See* Am. Order Staying Redeemer Actions, Adv. Pro. No. 10-03496, ECF No. 418.; *Fairfield I*, 2018 WL 3756343, at *3 (Bankr. S.D.N.Y. Aug. 6, 2018).

In April 2014, the Privy Council, the highest judicial authority in the BVI, affirmed dismissal of the Plaintiffs' BVI law claims for restitution based on mistaken payment. *Fairfield Sentry Ltd. (In Liquidation ) v. Migani*, [2014] UKPC 9 ("*Migani*").[4] The Privy Council held that the Plaintiffs' claims for restitution are governed by BVI law. *Id.* ¶ 17. Under BVI law, the Plaintiffs' claims to recover redemption payments depended on whether Sentry was bound to make those payments under the "true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or . . . the NAV per share which was determined by the Directors at the time of redemption." *Id.* ¶ 19. The Privy Council concluded

---

[3] Other causes of action included unjust enrichment, money had and received, unfair preferences under BVI's Insolvent Act § 245, undervalue transactions under the Insolvent Act § 246, breach of contract, and breach of the implied covenant of good faith and fair dealing. *See Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d at 463, (S.D.N.Y. 2022).

[4] *Migani* is available https://jcpc.uk/uploads/jcpc_2012_0061_judgment_416722c30e.pdf and, without numbered paragraphs, on the Westlaw database at *Fairfield Sentry Ltd (In Liquidation) v Migani*, 2014 WL 1219748.

that the NAV had to be definitively determined at the time of the subscription or redemption.  *Id.*
¶ 21.  The redemption payments made under the NAV were thus not subject to restitution and the
payee was not unjustly enriched by receiving funds, even if the amount was mistaken.  *Id.* ¶¶ 18–
19.

After *Migani*, the Plaintiffs allegedly obtained evidence of bad faith of Citco, the Fairfield
Fund's administrator, when it issued redemption certificates.  *See Fairfield I*, 2018 WL 3756343,
at *5–6 (Bankr. S.D.N.Y. Aug. 6, 2018).  Plaintiffs moved to amend the complaint, seeking to add
allegations that Citco lacked good faith when it issued certificates for redemptions and was aware
that the NAV was inflated at the time.  *See id.* at *6.  The Plaintiffs argued that the certificates
would not be binding under the Funds' Articles if they were not issued in good faith.  *Id.*

In December 2018, this Court found that the Plaintiffs could allege bad faith on behalf of
Citco in the U.S. proceedings and could seek recovery of the redemption payments only "where a
Defendant knew the NAV was inflated at the time of redemption."  *Fairfield II*, 596 B.R. at 295.
Of the common law claims, the Court allowed only the Plaintiffs' claims for constructive trust
against the so-called "Knowledge Defendants" to proceed.  *Id.* at 301 ("The suggestion that the
subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the
contract and requires restitution lacks support. The only exception concerns the Knowledge
Defendants that received redemption payments with the knowledge that the NAV was wrong. In
those circumstances, the Liquidators may seek to impose a constructive trust.").  In December
2020, this Court ruled that § 546(e) bars Plaintiffs' BVI avoidance claims to recover unfair
preferences and undervalue transactions.  *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *1
(Dec. 14, 2020) ("*Fairfield III*").

Following these decisions, only the constructive trust claims survived.  *Id.*; *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2021 WL 771677, at *1 (Bankr. S.D.N.Y. Feb. 23, 2021) ("*Fairfield IV*"), *aff'd*, 630 F. Supp. 3d 463 (2022).  The Liquidators filed a further motion to amend the complaints against the Knowledge Defendants.  Mot. to Amend, ECF No. 146; Mot. to Amend, Adv. Pro. No. 10-03496, ECF No. 3737.  On August 5, 2021, this Court granted the motion to amend the complaint and lifted the stay of the redeemer actions.  Order Granting Mot. to Amend, ECF No. 166; Order Lifting Stay of Redeemer Actions, ECF No. 165.

## C.  **THE PENDING MOTION**

The Amended Complaint seeks the imposition of a constructive trust on 15 redemption payments received from the Fairfield Funds.  *See* Am. Compl. ¶ 193, Ex. A, Ex. B, ECF No. 143. The Amended Complaint alleges that Defendant had knowledge of the fraud at BLMIS and therefore knowledge that the NAV was inflated.  *Id.* ¶ 183.  "By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma."  *Id.* ¶ 190.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact."  *Fairfield II*, 596 B.R. at 293.  As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the BVI, 'the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; second, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and third, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty.'

*In re Fairfield Sentry Ltd.*, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) (quoting *El Ajou v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

The Amended Complaint alleges that BNP and several other defendants purposefully availed themselves of the laws of the United States and the State of New York by "investing money

with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and maintaining bank accounts in the United States at BNP Paribas, and in fact receiving Redemption Payments in those United States-based and/or New York-based accounts." Am. Compl. ¶ 20. The Amended Complaint further alleges that BNP "selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, upon information and belief, designated United States-based and/or New York-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those bank accounts." *Id.*

The parties engaged in personal jurisdiction discovery between September 2021 and August 2022. *See* Am. Scheduling Order, ECF No. 179; Second Am. Scheduling Order, ECF No. 224. Due to alleged spoilation of evidence, Plaintiffs filed a motion for sanctions on January 20, 2023. *Memorandum of Law in Opposition to BNP Paribas Securities Services Luxembourg's Motion to Dismiss* (the "Opposition" or "Opp'n") at 6, ECF No. 263; Motion for Sanctions, ECF No. 243. After briefing and oral argument on March 15, 2023, the Court "concluded that (i) Defendant spoliated evidence in violation of Federal Rule of Civil Procedure 37(e) as made applicable here by Federal Rule of Bankruptcy Procedure 7037; (ii) Defendant acted with intent in doing so; and (iii) such spoilation has prejudiced the Liquidators." *Order Granting Motion for Sanctions under Rule 37(e) Against BNP Paribas Securities Services Luxembourg* (the "Spoilation Order") at 1, ECF No. 247. The Court entered an adverse inference against Defendant "that any spoliated evidence would have been favorable to the Liquidators in establishing personal jurisdiction." *Id.* at 2.

Defendant has moved to dismiss the Amended Complaint for lack of personal jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts with the forum

to establish personal jurisdiction over Defendant and that exercising personal jurisdiction would be unreasonable.  *See* Mem. L. at 3–5, ECF No. 169.

The Liquidators filed an opposition to the Motion and submitted the declarations of David Flugman and Sara Joyce.  Opp'n, ECF No. 263; *Declaration of David S. Flugman in Support of Liquidators' Opposition to BAN Paribas Securities Services Luxembourg's Motion to Dismiss* ("Flugman Decl."), ECF No. 264; *Declaration of Sara K. Joyce*, ECF No. 265.[5]  The Liquidators argue that exercising jurisdiction over Defendant would be reasonable and that Defendant's United States contacts — conducting due diligence on the Fairfield Funds, knowingly and intentionally investing in the Fairfield Funds, using U.S. correspondent accounts to invest in and receive payments from Sentry, and conducting other business activities — support personal jurisdiction. *See* Opp'n at 2–4.  Defendant filed a reply memorandum, along with a declaration of Ari MacKinnon and an expert declaration of Vance Price.  *See* Reply, ECF No. 286; *Declaration of Ari MacKinnon in Support of BNP Paribas Securities Services Luxembourg's Reply Memorandum of Law in Further Support of Its Motion to Dismiss for Lack of Personal Jurisdiction*, ECF No. 286-1; *Expert Declaration of Vance S. Price*, ECF No. 286-5.  Plaintiffs filed a sur-reply and a supplemental declaration of Sarah Joyce.  *See Sur-Reply Memorandum of Law in Further Support of Liquidators' Opposition to Defendant's Motion to Dismiss*, ECF No. 296; *Supplemental Declaration of Sarah K. Joyce*, ECF No. 297.

---

[5]        Pursuant to various orders of this Court, portions of certain filings and supporting documents were filed under seal.  The Court will refrain from referring to any bank account numbers or names of individual employees, named only in sealed documents, in full.

## IV.    DISCUSSION

### A.  THE LAW OF PERSONAL JURISDICTION

To subject a defendant to personal jurisdiction in the United States, due process requires that the defendant have sufficient minimum contacts with the forum in which the defendant is sued "'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  "In adversary proceedings, courts must determine whether the defendant has minimum contacts with the United States, rather than with the forum state."  *Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021) (citing *In re Lehman Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)).  "When jurisdiction is satisfied through Bankruptcy Rule 7004,[6] a bankruptcy court need not address its state's long-arm statute."  *Id.* n.12; *see also Owens-Illinois, Inc. v. Rapid Am. Corp.* (*In re Celotex Corp.*), 124 F.3d 619, 630 (4th Cir. 1997).

An analysis of minimum contacts "focuses on the relationship among the defendant, the forum, and the litigation," a relationship that "must arise out of contacts that the defendant himself creates with the forum State."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations omitted).

---

[6]      "The summons and complaint and all other process except a subpoena may be served anywhere in the United States." Fed. R. Bankr. P. 7004(d).  A bankruptcy court may exercise personal jurisdiction over a defendant served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States." Fed. R. Bankr. P. 7004(f).

There are three conditions necessary for the Court to exercise specific jurisdiction[7] over the non-resident defendant:

> First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State. Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct. Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(2), the Plaintiffs "must make a prima facie showing that jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)). A trial court has considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2). *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies depending on the procedural posture of the litigation." *Id.* (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Following discovery, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball*, 902 F.2d

---

[7]    Courts recognize "two types of personal jurisdiction: general and specific jurisdiction. A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)). The Plaintiffs do not allege that the Court has general jurisdiction over Defendant. *See* Mem. L. at 9, ECF No. 169 ("Plaintiffs do not allege that the Court has general jurisdiction over [BNP], a Luxembourg bank that is not 'at home' in the United States, and so [Plaintiffs] must plead facts supporting the exercise of specific jurisdiction over [Defendant]."); Opp'n at 2, ECF No. 263 (arguing that the Court's specific jurisdiction is founded on Defendant's contacts with the forum that relate to the claims at issue).

at 197.  "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction.'"  *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL 5016884, at *4 (S.D.N.Y. June 30, 2023) (quoting *Dorchester Fin. Sec.*, 722 F.3d at 85).  "Now that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy."  *Averbach,* 2023 WL 5016884, at *6 (citing 722 F.3d at 85).  "Plaintiffs need only show that their prima facie showing of jurisdiction is factually supported."  *Id.* at *6.  When considering a motion to dismiss before or after jurisdictional discovery has taken place, "the court must 'construe the pleadings and affidavits in the light most favorable to plaintiffs,' and resolve all doubts, including factual disputes, in the plaintiff's favor."  *Id.* at *4 (quoting *Ball*, 902 F.2d at 197).  Further, pursuant to the Spoliation Order, this Court will make "an adverse inference… against [the] Defendant that any spoliated evidence would have been favorable to the Liquidators in establishing personal jurisdiction…."  Spoliation Order, ECF No. 247.

## B.  <u>ANALYSIS OF PURPOSEFUL AVAILMENT</u>

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there."  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) ("*Licci IV*")).  For specific personal jurisdiction, "'[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit,' and the plaintiff's claim must in some way 'arise from the defendant's purposeful contacts with the forum.'"  *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)).  "Although a defendant's contacts with the forum state may be 'intertwined with [its] transactions or interactions with the plaintiff or other parties . . . [,]

a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction.'" *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*, 571 U.S. at 134) (alteration in original). "It is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *Id.*

BNP asserts that "Plaintiffs have elsewhere conceded [that] every material element of the transaction is 'purely foreign.'" Mem. L. at 10, ECF No. 169. Defendant points to the Plaintiffs' arguments before the District Court, wherein Plaintiffs argued that "every relevant component of the transactions at issue here occurred outside the territorial jurisdiction of the United States." *Id.* at 2; *see also Plaintiffs-Appellants' Opening Brief for Second Round Appeal* at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (S.D.N.Y. July 21, 2021), ECF No. 440 (the "Opening Brief"). The Plaintiffs' Opening Brief concerned the extraterritorial application of the § 546(e)[8] safe harbor. *See* Opening Brief at 24 (arguing that the "Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply extraterritorially to shield from avoidance settled securities transactions that occurred exclusively outside the United States.").

As another bankruptcy court in this district has stated, the "tests for personal jurisdiction and extraterritoriality are not the same." *Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Israel Corp.)*, 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017). In *Spizz*, the bankruptcy court was able to simultaneously find that the "[t]ransfer was not domestic, and hence, cannot be avoided"

---

[8]    Section 546(e) of the Bankruptcy Code prohibits a trustee from avoiding a transfer that is a margin payment or settlement payment "made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract. . . ." 11 U.S.C. § 546(e). "By its terms, the safe harbor is a defense to the avoidance of the *initial* transfer." *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original).

13

under § 547, while also clarifying that by "attend[ing] meetings in New York around the time of, and apparently in conjunction with, the commencement of the chapter 11 case," a defendant may be "subject to specific personal jurisdiction." *Id.* at 613–14.

By arguing in the District Court that the redemption transfers were foreign for purposes of extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum for purposes of personal jurisdiction. To determine whether a transaction is foreign or domestic for analyzing extraterritoriality issues for federal statutes, courts look at whether the "conduct relevant to the statute's focus occurred in the United States." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 326, 136 S. Ct. 2090, 2094, 195 L. Ed. 2d 476 (2016). To determine whether personal jurisdiction is appropriate, however, courts analyze a defendant's contacts with the forum "under a totality of the circumstances test." *Licci IV*, 732 F.3d at 170 (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).

Here, the Plaintiffs advance three arguments in support of their assertion that Defendant has sufficient minimum contacts to establish personal jurisdiction. Opp'n at 14–15, ECF No. 263. First, Plaintiffs claim that BNP "purposefully availed itself of the United States by intentionally investing in BLMIS feeder funds, Sentry and Sigma, with the express intention of profiting from BLMIS's investments in the U.S. securities market…." *Id.* at 15. Second, Plaintiffs assert that BNP used New York bank accounts to effectuate its investments and redemptions from Sentry. *Id.* Third, Plaintiffs argue that BNP conducted other related business in the United States. *Id.* The Court finds that each of the first and second arguments are independently sufficient to satisfy the first prong of the test for specific jurisdiction. The third argument alone is insufficient; however, it provides incremental support under the totality of the circumstances. Thus, overall, the purposeful availment element of the test for personal jurisdiction is met.

### 1. __Defendant's Investment in BLMIS Feeder Funds__

The Plaintiffs argue that "[t]he facts averred and evidence presented by the Liquidators make clear that [BNP] intentionally invested in BLMIS feeder funds Sentry and Sigma knowing that the Funds were designed to subsequently invest that money in New York-based BLMIS." Opp'n at 15, ECF No. 263.  The Plaintiffs rely on *Picard v. Bureau of Labor and Insurance*, 480 B.R. 501 (Bank. S.D.N.Y. 2012) ("*BLI*") and subsequent cases for the proposition that parties avail themselves of the benefit of New York law when they invest in feeder funds knowing the ultimate destination is BLMIS in New York.  Opp'n at 15–16.  The Plaintiffs highlight that BNP affirmed it received and read the Sentry Private Placement Memorandum ("PPM") when it signed the subscription agreement.  *Id.* at 17–18; Flugman Decl. Ex. 3 at -131, ECF No. 264 ("Subscriber has received and read a copy of the [PPM]").  Additionally, the Plaintiffs note that the Defendant "requested and received PPMs in electronic form on at least one occasion."  Opp'n at 18; *see* Flugman Decl. Ex. 10 (email from a BNP employee to a Citco Fund Services employee requesting "the prospectus of [Sentry] for [BNP's] audit" — a request which the Citco Fund Services employee responded to by sending over a Private Placement Memorandum dated October 1, 2004 (such memorandum, the "October 2004 Memorandum")).  The Liquidators also argue that these PPMs made clear that substantially all the assets of Sentry were controlled by the U.S.-based BLMIS.  *See id.* at 8; *see also* Flugman Decl. Ex. 12 at -156, -161–62 (October 2024 Memorandum).  Next, due to the spoliation of evidence, Plaintiffs ask the Court to infer that destroyed evidence includes Sentry and Sigma PPMs, diligence, and other "knowledge about the relationship between the Funds and BLMIS."  Opp'n at 18.  Lastly, contrary to Defendant's assertions in the Reply, Plaintiffs do not ask the Court to treat the Fairfield Funds and BNP as a single corporate entity.  *See* Reply at 2, ECF No. 286.

The Defendant argues that these allegations are "jurisdictionally irrelevant." Mem. L. at 9, ECF No. 169. The Defendant contends that under *Walden*, "mere knowledge that Sentry would invest the money it raised in the BVI with BLMIS in New York is insufficient as a matter of law to support jurisdiction." *Id.* at 11 (citing *Walden v. Fiore*, 571 U.S. 277 (2014)). Further, the Defendant argues that the Plaintiffs' foreseeability theory "is nothing more than the type of threadbare 'stream of commerce' theory of personal jurisdiction rejected by the Supreme Court." *Id.* at 13 (citing *J. McIntyre Mach., Ltd. v. Nicastro,* 564 U.S. 873, 882, 886 (2011)). Additionally, the Defendant argues that the case here can be distinguished from the circumstances in *BLI* — "[p]laintiffs' claims in this case do not arise from the BLIMS investments; they arise from the redemption payments made by the Funds from the BVI to foreign defendants." *Id.* at 14; *see also BLI*, 480 B.R. 501, 516–19. Moreover, the Defendant argues that "it simply is not credible that [BNP] would have understood that investing in the BVI-incorporated Funds would subject it to U.S. jurisdiction with respect to claims arising out of the receipt of moneys from those BVI-based Funds." *Id.*

Here, the Court agrees with the Plaintiffs that *BLI* provides strong support. In *BLI*, as here, the defendant invested "millions of dollars in Fairfield Sentry with the specific purpose of having funds invested in BLMIS in New York…." *BLI*, 480 B.R. 501, 517. Contrary to the Defendant's assertion, jurisdiction did not turn on the nature of the claim. *See id.* Rather, in *BLI,* the court held it had personal jurisdiction because the defendant knew — due to its diligence and review of PPMs — that 95% of its funds would enter the New York securities market. *See id.*

The Court therefore reaches a similar conclusion. The available evidence combined with adverse inferences drawn pursuant to the Spoilation Order show BNP knew it directed its investment towards BLMIS in New York. In the subscription agreement, BNP acknowledged

16

receipt of a PPM.  *See* Flugman Decl. Ex. 3 at -131, ECF No. 264.  Indeed, the PPM dated October

1, 2004 indicates that BLMIS held "approximately 95% of [Sentry]'s assets under custody," and

that Sentry's fund manager only had discretion to allocate "a portion of the Fund's assets (never

to exceed, in the aggregate, 5% of the Fund's Net Asset Value…) to alternative investment

opportunities…."  Flugman Decl. Ex. 12 at -156, -161–62.  Pursuant to the Spoilation Order, the

Court finds it appropriate to infer that the corresponding PPM received contains information

favorable to establish personal jurisdiction.  *See* Spoliation Order, ECF No. 247.  Specifically, the

Court infers that the PPM referenced in the subscription agreement matches other PPMs available

in evidence, showing approximately 95% of the funds would arrive in the U.S.  *See* Flugman Decl.

Ex. 12 at -155, -161; *see also id.* Ex. 13 at -644, -652.  Similarly, BNP's diligence would indicate

their investment's ultimate destination was New York.  *See* Spoliation Order; Flugman Decl. Ex.

17 at -386 (requesting prospectuses for Fairfield Funds and stating, "to fulfill our legal obligations

we are required to have some information on the assets we hold in custody.").  Ultimately, BNP's

use of intermediary Feeder Funds does not make its contacts any less purposeful under these

circumstances.  Together, the PPM and diligence support that BNP's investment in the Funds was

a clear directive to invest in New York-based BLMIS.

    In addition to *BLI*, *Walden* also provides support for the Plaintiffs.  In *Walden*, the Supreme

Court found that a defendant "formed no jurisdictionally relevant contacts" with the forum state

of Nevada as "[p]etitioner never traveled to, conducted activities within, contacted anyone in, or

sent anything or anyone to Nevada."  *Walden*, 571 U.S. at 289.  The Supreme Court further stated

that it is impermissible to allow the "plaintiff's contacts with the defendant and forum to drive the

jurisdictional analysis."  Here, the Defendant's contacts, not the Plaintiffs' contacts, drive the

jurisdictional analysis. BNP knowingly sent tens of millions of dollars to New York. Am. Compl.
¶ 2, 20, ECF No. 143. These actions go beyond "mere knowledge."

Defendant next argues that the Liquidators' evidence of Defendant's contacts with the
United States amounts to little more than the stream of commerce theory rejected by *J. McIntyre
Mach., Ltd. v. Nicastro*, where the Court stated that "it is not enough that [a] defendant might have
predicted that its goods will reach the forum," but rather the defendant must "engage[] in conduct
purposefully directed at [the forum]." Mem. L. at 13 (citing 564 U.S. 873, 882–86 (2011)). Here,
the Defendant did not invest with a manager who had limitless discretion to allocate capital in
global securities markets. Indeed, the situation here is the exact opposite — BNP invested millions
in the Funds that had contractual obligations to allocate the capital in the United States. *See*
Flugman Decl. Ex. 3 at -131; *see also id.* Ex. 12 at -155, -161 (October 2004 Memorandum). That
is purposeful direction sufficient to meet the first requirement of specific jurisdiction.

### 2. <u>Defendant's Use of Correspondent Accounts</u>

Separately, the Plaintiffs argue that BNP's "intentional and recurring use of U.S.
correspondent accounts to subscribe for shares in Sentry and receive each of the at-issue Sentry
redemption payments independently supports the exercise of jurisdiction with respect to those
redemption payments." Opp'n at 26, ECF No. 263. "Correspondent accounts are accounts in
domestic banks held in the name of foreign financial institutions" that are used "to effect dollar
transactions." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir.
2012) (quoting *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104, 650
N.Y.S.2d 726, 727 (1st Dept 1996)). Citing *Licci IV*, 732 F.3d at 171, the Plaintiffs assert that
Defendant's use of a correspondent bank account supports jurisdiction because it was deliberate,
recurring, and related to the harm at issue. Opp'n at 32–34.

First, as to deliberateness, Plaintiffs contend that BNP chose its own U.S. correspondent account for both subscription and redemption payments. *See* Flugman Decl. Ex. 3 at -137, -138, ECF No. 264; *Id.* Ex. 4. Additionally, according to the Plaintiffs, the Defendant's choice to use Sentry's U.S. correspondent account for subscription payments also supports personal jurisdiction under *Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank* ("*Arcapita I*"), 549 B.R. 56, 68-69, 70 n.18 (S.D.N.Y. 2016).

Second, as to the recurring element of *Licci IV*, Plaintiffs show that BNP "processed at least 30 transactions, amounting to more than $60 million, through its own and Sentry's U.S. correspondent accounts." Opp'n at 32. Of the 30, BNP "received 12 redemption payments from Sentry totaling $39,662,951.91 over four years through [its U.S. correspondent] account." *Id.*; *see* Am. Compl. ¶ 55 & Ex. A, ECF No. 143; *see also* Flugman Decl. Exs. 19, 21, 23 (Redemption Records). The remaining 18 transactions, totaling $22,505,000, were subscription payments where BNP used both its own and Sentry's U.S. correspondent accounts as part of a chain of transactions. Opp'n at 32; *see* Flugman Decl. Exs. 4–8 (Subscription Records). Based on precedent regarding correspondent bank use, Plaintiffs argue the frequency and size of BNP's correspondent bank transactions are sufficient for jurisdiction. Opp'n at 32 (citing *Averbach v. Cairo Amman Bank*, 2020 WL 486860, at *5 (S.D.N.Y. Jan. 21, 2020); *Schansman v. Sberbank of Russia PJSC*, 2021 WL 4482172, at *5 (S.D.N.Y. Sept. 30, 2021); *Arcapita I*, 549 B.R. at 70, n.18).

Finally, for the third element of *Licci IV* — the contacts' relation to the harm — Plaintiffs argue that BNP's "use of U.S. accounts is sufficiently related to the Liquidators' claims seeking to recover Sentry redemption payments." Opp'n at 34. To succeed on their constructive trust claim, the Plaintiffs must demonstrate that BNP received inflated redemption payments. *See id.* The Plaintiffs argue, therefore, that BNP "accomplished the wrongs for which the Liquidators seek

redress using the New York banking system to buy shares and obtain the redemption payments for those shares the Liquidators seek to claw back…. That is enough to establish jurisdiction over BNP SSL with respect to the redemption payments at issue." *Id.*

BNP counters that "the passive receipt of money transmitted by the Funds themselves does not support the exercise of personal jurisdiction." Mem. L. at 14, ECF No. 169. Defendant first highlights that Sigma never used U.S. accounts and argues that the Court should dismiss claims arising from Sigma redemptions. *Id.* Next, Defendant argues that their use of U.S-based bank accounts was "incidental" and part of a series of common market transaction insufficient to confer jurisdiction. *Id.* at 15–16.

BNP seeks to distinguish Plaintiffs' reading of *Arcapita I* and *Licci IV*. *Id.* at 17–19. Regarding *Arcapita I*, the Defendant believes that case is "inapposite because the contracts there were materially more purposeful than those alleged here." *Id.* at 17. As for *Licci IV*, Defendant believes "the Second Circuit concluded that wire transfers from a correspondent bank account could establish personal jurisdiction when the transfers are part of the 'principal wrong' alleged." *Id.* Thus, BNP argues, because BNP's "incidental" use of U.S. accounts is not the principal wrong, jurisdiction cannot lie. *Id.* at 18-19.

### a.  Whether the Defendant's Use of U.S.-Based Correspondent Accounts Was Deliberate and Recurring

As a threshold matter, Defendant is correct to exclude Sigma from this analysis. Mem. L. at 14, ECF No. 169. Indeed, the Liquidators recognize that BNP did not use U.S. accounts for that Sigma redemption transactions.[9] *See* Opp'n at 27 n.21, ECF No. 263. Accordingly, Plaintiffs'

---

[9]    However, the Plaintiffs also argue that "[BNP] is still subject to jurisdiction with respect to [its Sigma shares] redemptions, as the Liquidators' [other] jurisdictional theories … do not turn on correspondent account use and independently support jurisdiction over the Sigma redemptions." Opp'n at 27, n.21, ECF No. 263. The Court addresses the Liquidators' other jurisdictional arguments *supra*, Part IV.B.1., and *infra*, Part IV.B.3.

correspondent account theory for jurisdiction only applies to the constructive trust claim for the $39,622,951.91 redeemed from Sentry. *Id.* at 32; *see* Flugman Decl. Exs. 19, 21, 23, ECF No. 264 (Redemption Records).

As to the substance of the analysis, the Second Circuit has held that "the selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress, constitutes purposeful availment…." *Licci IV*, 732 F.3d at 171 (cleaned up). The Second Circuit further clarified that, "[s]o long as this in-forum activity sufficiently reflects the defendant's 'purposeful availment' of the privilege of carrying on its activities here, minimum contacts are established, even if the effects of the defendant's entire course of conduct are felt elsewhere." *Id.* at 173. Thus, a foreign bank's repeated use of a U.S. correspondent account to achieve the wrong complained satisfied the minimum contacts requirement. *Id.*

Like the defendant in *Licci IV*, BNP's use of U.S. correspondent accounts was deliberate. Specifically, the evidence shows that BNP actively selected U.S. accounts to receive the redemption payments. *See* Flugman Decl. Ex. 19 (Redemption Requests). These selections occurred repeatedly — 12 times for a total of nearly $40 million. Am. Compl. ¶ 55 & Ex. A, ECF No. 143; *see* Flugman Decl. Exs. 19, 21, 23 (Redemption Records). Those transactions make BNP's U.S. correspondent account an instrument because they facilitated the alleged wrongful redemptions. *See id.* Moreover, because BNP repeatedly selected a U.S. account to receive redemption payments, whether BNP felt the transaction's effects in BVI or Luxembourg is irrelevant in these circumstances. *See Licci IV*, 732 F.3d at 173 ("a [foreign defendant]'s repeated use of [a] correspondent account—and hence New York's banking system… satisfies the minimum contacts component of the due process inquiry."). And that U.S. account was

21

instrumental to the harm alleged — the wrongful receipt of the redemption payments.  BNP's use of U.S. correspondent accounts satisfies the minimum contact relatedness requirements under *Licci IV*.

BNP's use of U.S.-based correspondent account was also recurring.  Indeed, even setting aside the subscription payments, the frequency and size of the redemption payments alone are sufficient to show purposeful availment.  In *Licci IV*, the Second Circuit found "dozens" of U.S. correspondent account transactions for several million dollars sufficient.  *See* 732 F.3d 161, 171 (2d Cir. 2013).   Moreover, in *Arcapita I*, a single $10 million investment using a U.S. correspondent bank was sufficient.  *See* 549 B.R. at 61, 70.  BNP's dozen redemption payments for nearly $40 million fit well within the facts of these two cases.  *See* Am. Compl. ¶ 55 & Ex. A; *see* Flugman Decl. Exs. 19, 21, 23 (Redemption Records).  They show a pattern of recurring transactions and are not "random, isolated, or fortuitous."  *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984).  The Defendant's attempt to frame these transactions as "incidental" and "passive" is also inconsistent with the record.  BNP took an affirmative action when it sought to redeem shares in Sentry.  As part of this act, it made a choice to provide the account details of its U.S. correspondent bank for the redemption payments.  *See* Flugman Decl. Exs. 19, 21, 23 (Redemption Records).

Given the non-incidental nature of the redemption transactions, *Hill v. HSBC Bank PLC*, 207 F. Supp. 3d 333 (S.D.N.Y. 2016) and *Hau Yin To v. HSBC Holdings PLC*, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017) can also be distinguished.  *See* Mem. L. at 16; *see also* Reply at 10, ECF No. 286.   In *Hill*, the court held the defendant, a fund administrator, did not avail itself of jurisdiction because its administrative and custodial contacts with New York were "incidental" to the foreign contract.  *Hill*, 207 F. Supp. 3d at 337, 339–40.  Similarly, in *Hau Yin To*, the defendant

entered into custodial agreements and the court also held the New York communications insufficient. *See Hau Yin To*, 2017 WL 816136, at *6. BNP's contacts, however, differ in importance and degree. BNP's use of U.S. correspondent accounts facilitated the central transaction at issue — the redemption of Sentry shares. Further, a dozen transactions for nearly $40 million is more substantial than mere communications with New York.

In contrast to *Hill* and *Hau Yin To*, *Arcapita I* supports a finding of purposeful availment. There, the bankruptcy court found that a foreign bank purposefully availed itself of the forum because the bank selected U.S. dollars and U.S. correspondent accounts. *See Arcapita I*, 549 B.R. at 61, 69. Similarly, BNP chose U.S. dollars and U.S. correspondent accounts when it chose to purchase shares of dollar-based Sentry. Defendant's argument that Sentry chose the currency misses the point because, more importantly, BNP chose Sentry when it could have chosen a viable foreign option, Sigma. *See* Mem. L. at 17; *see also* Reply at 8.

### b.  Whether the Defendant's Use of U.S.-Based Correspondent Account Relate to the Harm Alleged By the Liquidators

Having found that BNP's use of a U.S.-based correspondent account was deliberate and recurring, the Court now turns to the third *Licci IV* factor — relatedness to the harm. To satisfy this factor, the suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 141 S. Ct. 1017, 1026 (2021) (emphasis in original). "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required. *Id.* at 1027. Instead, a court need only find "an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to

personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).  This Circuit has "found that a claim arises out of forum contacts when defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum."  *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 151 (2d Cir. 2019).

Plaintiffs' constructive trust claim has three elements: (1) a disposal of the Plaintiffs' assets in breach of fiduciary duty; (2) the beneficial receipt of the assets by the Defendant; and (3) that the Defendant has knowledge it received the assets via a breach of fiduciary duty. *In re Fairfield Sentry Ltd.*, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) (quoting *El Ajou v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700); *see also supra*, Part III.C.

Plaintiffs make four arguments as to why Defendant's contacts relate to the constructive trust claim.  First, Plaintiffs argue that Defendant's initial investment relates to the ultimate redemption because "[w]ithout the subscriptions [BNP] would have had no shares to redeem and could not have received the redemption payments to which its subscriptions gave rise."  Opp'n at 22, ECF No. 263.  Second, the subscription agreement's forum-selection and choice of law clauses "gave rise to the redemption payments at issue."  *Id.* at 24.  Third, BNP's "presumptive due-diligence-related activity contributed to its knowledge that the NAVs were inaccurate—a core element of the Liquidators constructive trust claims."  *Id.* at 26.  Fourth, Plaintiffs argue that Defendant's use of correspondent bank accounts relates to their claim because "[BNP] accomplished the wrongs for which the Liquidators seek redress using the New York banking system to buy shares and obtain the redemption payments for those shares the Liquidators seek to claw back."  *Id.* at 34.

BNP counters that the claim is based on redemptions from Citco and not the subscription payments. Mem. L. at 10, ECF No. 169. The Defendant distinguishes the present case from *U.S. Bank National Association v. Bank of America N.A.*, 916 F.3d 143 (2d Cir. 2019) and *In re Fairfield Sentry Ltd.*, 627 B.R. 546, 568 (S.D.N.Y. Bankr. 2021). *Id.* at 11. BNP asserts that those cases found jurisdiction because the defendant's activities occurred in the U.S. and BNP's actions related to the constructive trust claim all occurred outside the U.S. *Id.*

Here, the Plaintiffs' correspondent bank argument is more than sufficient to meet this second prong. Opp'n at 34. A constructive trust claim requires showing receipt of the assets. *See In re Fairfield Sentry Ltd.*, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021). The use of a U.S. correspondent bank account shows receipt of assets. That receipt is "at the heart of this cause of action" because "[t]he receipt of the funds in New York is precisely… the activity that the cause of action seeks to have voided." *Arcapita I*, 549 B.R. at 69. Defendant's attempt to distinguish this case fails because this BNP action occurred inside the U.S. and relates to the constructive trust claim.

Further, the issue of knowledge of the inflated NAV, required for the constructive trust claim, is inextricably tied to the Defendant's investments with New York-based BLMIS. The allegations are directly related to Defendant's investment activities with BLMIS through the Fairfield Funds. *See* Am. Compl. ¶¶ 181–83, ECF No. 143. The Defendant's contacts with the United States, in investing in, and receiving redemptions from, the Fairfield Funds, form a "sufficiently close link" between the defendant, the forum and the litigation concerning Defendant's activities in the forum. *See MSP Recovery Claims, Series LLC v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773, at *3 (S.D.N.Y. Sept. 29, 2021) (quoting *Ford Motor Co.*, 141 S. Ct. at 1032). Accordingly, the Court finds that BNP's use of an U.S.-based correspondent account

to facilitate Sentry redemption payments were sufficiently related to the harm alleged by the Liquidators.

### 3. <u>Defendant's Business Contacts with the Forum</u>

Plaintiffs allege that BNP's "additional U.S.-oriented business activity related to the Liquidators' claims also supports the exercise of jurisdiction." Opp'n at 23, ECF No. 263. First, Plaintiffs argue the subscription agreements' designation of New York as the dispute resolution forum support the exercise of jurisdiction. *Id.* at 24. Additionally, BNP also "used its New York-based affiliate, the 'BNP Equity Derivatives' division to facilitate transactions with the Funds." *Id.* at 24–25. Plaintiffs argue the affiliates' contact, coupled with other communications, supports exercising jurisdiction. *See id.* at 25.

Second, Plaintiffs advocate for additional inferences due to the destruction of evidence. *Id.* at 25. Specifically, the Plaintiffs ask this court to infer, pursuant to the Spoilation Order, that BNP engaged in diligence-related activities similar to defendants in other BLMIS actions. *Id.* at 26. Plaintiffs argue that these contacts relate to their claims because diligence would contribute to Defendant's "knowledge that the NAVs were inaccurate—a core element of the Liquidators' constructive trust claims." *Id.*

In response, Defendant argues BNP's business contacts cannot create jurisdiction due to past rulings: "Courts in this District have already held—in the context of these cases—that the forum selection clause does not support the exercise of personal jurisdiction in connection with the Liquidators' claims to claw back redemption payments." Reply at 13, ECF No. 286; *see Fairfield Sentry Ltd. (In Liquidation) by & through Krys v. Citibank, N.A. London*, No. 19-CV-3911 (VSB), 2022 WL 4391023, at *12 (S.D.N.Y. Sept. 22, 2022). BNP argues that because the claims arise from BVI law, the subscription agreement's forum selection clause is irrelevant and cannot confer jurisdiction. Reply at 13.

26

The Defendant also opposes Plaintiffs' request for the Court to infer evidence of diligence and other communications. *Id.* at 15–16. The Defendant asserts that "[t]here is no basis to conclude that a nominal shareholder like [BNP] would have communicated about the Fairfield Funds in the same way as differently situated entities that invested their own capital in the Fairfield Funds." *Id.* at 15. Additionally, the Defendant argues that the Plaintiffs have no factual basis to conclude knowledge of inaccurate NAVs due to the presumption of diligence. *Id.* at 16. Finally, as a fallback, Defendant argues that "even if the Court were to presume that any of Plaintiffs' hypothesized contacts with the U.S. existed, Plaintiffs have failed to show that the contacts sufficiently relate to their claims to support a finding of jurisdiction." *Id.*

Here, the Court concludes the additional business contacts alone do not support jurisdiction. But these contacts still provide incremental support because the Court evaluates "the quality and nature of the defendant's contacts… under a totality of the circumstances test." *Licci IV*, 732 F.3d at 170 (citations omitted).

First, the forum selection clause provides some support for jurisdiction. In *Fairfield I*, Judge Bernstein held the forum selection clause did not confer personal jurisdiction. 2018 WL 3756343, at *12. That holding, however, does not make the clause irrelevant. A contract's choice of law clause can still carry weight when considering if a defendant has purposefully availed itself of the benefits of a jurisdiction. *Burger King Corp. v Rudzewicz*, 471 US 462, 482 (1985) (explaining a choice of law provision can establish jurisdiction in conjunction with other evidence). Defendant purchased the shares relevant to this case through contracts with a New York forum selection clause. *See, e.g.*, Flugman Decl. Ex. 4 at -966, -121, -249, ECF No. 264 ("This [subscription agreement] shall be governed and enforced in accordance with the laws of

27

New York…").  Although not determinative, the New York forum selection clause shows some purpose to do business in the U.S.

Second, BNP's other contacts provide support for jurisdiction.  BNP used an affiliate to facilitate transactions with the Funds (Flugman Decl. Exs. 25-26); directed communications to a U.S. address in the subscription agreement (*Id.* Ex. 3 at -136; *Id.* Ex. 4 at -086); and one of its "Americas" employees communicated with Fairfield Greenwich Group (*Id.* Ex. 27).  Taken together, these contacts are ancillary to the primary transactions in this case — the redemption payments.  They more closely resemble the "incidental" contacts in *Hau Yin To* and *Hill*.  *Hau Yin To*, 2017 WL 816136, at *6; *Hill*, 207 F. Supp. 3d at 339–40.  Accordingly, under the totality of the circumstances, these contacts provide little support.

Third, inferences of evidence pursuant to the Spoilation Order present a more difficult issue.  The Spoilation Order allows the Court to draw an adverse inference that "any spoliated evidence would have been favorable" to the Plaintiffs.  ECF No. 247.  The challenge, however, is determining what the spoliated evidence is.  Certainly, BNP received PPMs because the subscription agreements reference them.  *See* Flugman Decl. Ex. 3 at -131.  For those deleted PPMs, the Court draws a negative inference.  However, beyond that, and the other business contacts cited above, the Court will not presume new evidence or infer business practices due to other defendants' activities from different cases.  Reply at 15.  Moreover, like the other communications, these inferred contacts would have minimal impact on the personal jurisdiction analysis.  The Court declines to make any further inferences pursuant to the Spoilation Order at this time.

## C. **WHETHER ASSERTION OF PERSONAL JURISDICTION IS REASONABLE**

If a defendant has sufficient minimum contacts, the Court must then ask, "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).  Where the plaintiff "makes the threshold showing of the minimum contacts required for [exercising personal jurisdiction], a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3 (quoting *Bank Brussels Lambert*, 305 F.3d at 129).  Factors the Court will consider include the burden on the defendant, the interests of the forum in adjudicating the case, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the states in furthering fundamental substantive social policies.  305 F.3d at 129.

The Defendant believes exercising jurisdiction is unreasonable.  First, it believes that Plaintiffs must make a strong showing of reasonableness to supplement Plaintiffs' reliance on "incidental" contacts.  Mem. L. at 20, ECF No. 169; Reply at 16, ECF No. 286.  From there, BNP first argues the U.S. interest is "minimal at best" because the "dispute is between exclusively foreign parties arising solely under foreign law pursuant to a foreign contract governing a purely foreign transaction."  Mem. L. at 21.  Moreover, BNP argues that finding jurisdiction in this case would make New York a forum for any foreign commercial dispute.  *Id.* at 4, 16.  Finally, the Defendant also argues that the proceeding is non-core, ancillary, and only tenable due to Chapter

15 recognition.  *Id.* at 23 (citing *In re Fairfield Sentry Ltd.*, 458 B.R. 665, 682 (S.D.N.Y. 2011) (Preska, C.J.)).

Defendant's reliance on *In re Fairfield Sentry Ltd.*, 458 B.R. 665, is misplaced.  In that case, the District Court determined whether the proceeding was core or non-core; it did not determine whether adjudication or jurisdiction in the United States was reasonable.  *See id.* at 675. Further, the Court has already found that it has subject matter jurisdiction over these proceedings. *See Fairfield I*, 2018 WL 3756343, at *8 (Bankr. S.D.N.Y. Aug. 6, 2018).  Chapter 15 allows for recognition of Sentry's foreign main proceeding.  11 U.S.C. § 1501(a) ("The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency . . .."); *id.* § 1504 ("A case under this chapter is commenced by the filing of a petition for recognition of a foreign proceeding under section 1515.").  Defendant correctly states that cases brought under Chapter 15 are ancillary to foreign proceedings.  *Fairfield I*, 2018 WL 3756343, at *2.  The ancillary character of such cases, however, does not necessarily mean that the United States has minimal interest in the dispute. Indeed, courts have recognized that the United States has a strong interest in ensuring the integrity of its financial systems, and the Court has repeatedly emphasized such interest in other adversary actions related to the BLMIS Ponzi scheme.  *See Licci IV*, 732 F.3d at 174 ("[T]he United States[] and New York [have an] interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism, money laundering, or other nefarious ends."); *see also Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Securities Services (Luxembourg) S.A., et al.* (*In re Fairfield Sentry Ltd.*), 658 B.R. 257, 277 (Bankr. S.D.N.Y. 2024); *Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Europe SE, Luxembourg Branch, et al.* (*In re Fairfield Sentry Ltd.*), 657 B.R. 1, 23 (Bankr. S.D.N.Y. 2024).

Next, the Defendant argues that jurisdiction would create substantial burdens for BNP because its participation could potentially generate liability under Luxembourg's bank secrecy laws. Mem. L. at 22. In support of this argument, BNP cites to the Court's Bench Ruling granting in part and denying in part a motion seeking relief as to the order staying the action and seeking expedited initial disclosures from certain beneficial holders. *See id.*; *see also* Bench Ruling, Adv. Pro. No. 10-03496, ECF No. 799 (the "July 2012 Bench Ruling"). The defendants before this Court in 2012 were able to describe "the strong and undeniable interest of many nations in enforcing their banking secrecy laws" and "significant bank customer confidentiality laws of no fewer than 30 countries, attested to by numerous declarations of foreign law experts and letters submitted by foreign governments" that could have been implicated or broken by complying with the Court's prior order. *See* July 2012 Bench Ruling at 2. As a result, the Court stated in the July 2012 Bench Ruling that it was "hard-pressed to find any compelling United States' interest in mandating discovery here *at this juncture* of the pending litigation." *Id.* at 2–3 (emphasis added). However, the July 2012 Bench Ruling does not support BNP's position that potential foreign liabilities render the Court's exercise of personal jurisdiction unreasonable. Courts in this Circuit have recognized that the threat of potential foreign liability is an issue more "appropriately considered in a separate comity analysis," and not in the context of assessing the reasonableness of personal jurisdiction. *See Nike, Inc. v. Wu*, 349 F. Supp. 3d 310, 333 (S.D.N.Y. 2018). Indeed, both the Court's July 2012 Bench Ruling and the District Court's *Nike, Inc. v. Wu* opinion considered foreign liability threat as part of an international comity analysis, not for personal jurisdiction purposes. *See id.* at 335, 340; *see also* July 2012 Bench Ruling at 1–2. Further, thus far, the parties have agreed on an effective redaction protocol. Presumably the parties can agree

on an effective discovery procedure in compliance with all relevant laws, including Luxembourg's bank secrecy laws, or the Court can establish one.

The Defendant has demonstrated that this Court's exercise of jurisdiction over it may impose a minimal burden in terms of requiring it to travel to the forum. However, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010); *see also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023). Indeed, BNP has participated in this litigation for over five years and is represented by U.S. counsel. *See, e.g.,* Notice of Appearance, ECF No. 96; Mot. to Dismiss Adversary Proceeding, ECF No. 102.

Finally, Defendant argues that Plaintiffs "have proffered no reason why the United States is a more reasonable forum than their home jurisdiction of the BVI or [BNP]'s home jurisdiction of Luxembourg." Mem. L. at 5. BNP suggests that the Liquidators may be engaged in forum-shopping through "strategic maneuvering" after losing in their initial BVI Claims. *Id.* at 22–23.

Defendant has alleged that other forums may be able to hear the claims. But the Defendant has not demonstrated how this forum would fail to provide effective relief. *See MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3. Here, the Defendant presumes but fails to establish that the Plaintiffs have no legitimate interest in obtaining relief in the United States — especially considering that this dispute stems from a Chapter 15 proceeding that has intimate connections to the New York-based BLMIS Ponzi scheme. Moreover, contrary to BNP's argument that finding jurisdiction here will make New York the forum for every foreign transaction, the record supports

that conferring jurisdiction over BNP fits squarely within existing caselaw.  *See* Mem. L. at 16–17.  The Defendant has not established that the Court's exercise of personal jurisdiction over it would be unreasonable.  The Court thus finds that exercising jurisdiction over the Defendant is reasonable and comports with "traditional notions of fair play and substantial justice . . .."  *See Int'l Shoe*, 326 U.S. at 316.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES the Defendant's Motion to Dismiss the Amended Complaint.  The Liquidators shall submit a proposed order consistent with the findings in this decision in accordance with Local Bankruptcy Rule 9074-1.

**IT IS SO ORDERED.**

Dated: May 12, 2025
      New York, New York

                                      /S/ John P. Mastando III_____
                                      THE HONORABLE JOHN P. MASTANDO III
                                      UNITED STATES BANKRUPTCY JUDGE